NATIONAL CLASSIFICATION COM-
MITTEE and National Motor Freight
Traffic Association, Inc., Petitioners,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

No. 83–2273.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 16, 1984.

Decided July 5, 1985.

As Amended July 5, 1985.

William W. Pugh, Washington, D.C.,
with whom Bryce Rea, Jr. and John R.
Bagileo, Washington, D.C., were on brief,
for petitioners.

Dennis J. Starks, Atty., I.C.C., Wash-
ington, D.C., with whom J. Paul McGrath,
Asst. Atty. Gen., Dept. of Justice, John
Broadley, Gen. Counsel, Lawrence H. Rich-
mond, Deputy Associate Gen. Counsel,
I.C.C., Robert B. Nicholson and Margaret
G. Halpern, Attys., Dept. of Justice, Wash-

ington, D.C., were on brief, for respondents. John P. Fonte, Atty., Dept. of Justice and Ellen D. Hanson, Atty., I.C.C., Washington, D.C., entered appearances for respondents.

Before WALD, EDWARDS and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

This is an action seeking review of the Interstate Commerce Commission's ("ICC" or "Commission") Final Decision in Ex parte No. MC–98 (Sub-No. 1), *Investigation Into Motor Carrier Classification*, 367 I.C.C. 243 (1983). The informal rulemaking proceeding that led to the decision was instituted in 1978 and concerned revisions in the national motor freight classification system ("NMFC")—a system that classifies commodities according to transportation characteristics in order to facilitate rate-making. The ICC revised and simplified the NMFC by condensing fifteen traditional transportation characteristics into four new characteristics: density, stowability, handling, and liability. In doing so, the ICC eliminated three economic factors that were traditionally considered in making classification decisions even though they were irrelevant to the transportability of a particular commodity. The National Classification Committee ("NCC") and the National Motor Freight Traffic Association, Inc. ("NMFTA"), organizations that represent various motor common carriers, have petitioned this court seeking review of the ICC's action. We affirm the decision of the ICC.

## I.

At the instigation of the ICC, motor common carriers in this country have long maintained a collective ratemaking system to set charges on all articles they move in interstate commerce. This is done in two steps. The first classifies all known commodities into a limited number of classes according to their transportation charac-

teristics. The NMFC contains nineteen such classes, which apply to hundreds of thousands of commodities. These classes are then used in conjunction with a rate schedule to determine the prices of particular shipments between various points of origin and destination.

The National Classification Committee maintains the NMFC pursuant to an agreement approved by the ICC under 49 U.S.C. § 10706(b) (1982). That section confers antitrust immunity on the NCC's collective activities that conform to the agreement. Approximately 3,000 carriers use the NMFC to publish their freight classifications. In Ex parte No. MC–22, *Motor Carrier Rates in New England*, 47 M.C.C. 657, 660 (1948), the ICC set forth the following fifteen transportation characteristics which have traditionally been used for freight classification:

(1) Shipping weight per cubic foot; (2) Liability to damage; (3) Liability to damage other commodities with which it is transported; (4) Perishability; (5) Liability to spontaneous combustion or explosion; (6) Susceptibility to theft; (7) Value per pound in comparison with other articles; (8) Ease or difficulty in loading or unloading; (9) Stowability; (10) Excessive weight; (11) Excessive length; (12) Care or attention necessary in loading and transporting; (13) Trade conditions; (14) Value of service; (15) Competition with other commodities transported.

In 1978, the ICC received complaints from several shippers, individual carriers, and government agencies concerning the classification system. The United States Department of Justice, for example, urged adoption of a cost-based system that would improve efficiency while providing fairer rates for small shipments. Accordingly, the ICC issued a notice of investigation and proposed rulemaking in Ex parte No. MC–98, *New Procedures in Motor Carrier Restructuring Proceedings*, 359 I.C.C. 399, 416, 528 (1978). *See also* 43 Fed.Reg. 14,-978 (1978). This rulemaking was to consider, *inter alia*, revisions in the fifteen traditional classification criteria and analysis of

what types of costs are relevant for rate-making.

On May 13, 1981, the ICC served its Interim Decision which recommended that the NMFC be revised. Ex parte No. MC–98 (Sub–No. 1), *Investigation into Motor Carrier Classification*, 364 I.C.C. 906 (1981). The stated purpose of undertaking revisions was to confine the classification process to considerations based upon relative physical transportability. Economic or ratemaking considerations were to be removed from the classification process. This was to be done by: (1) eliminating four of the fifteen traditional classification characteristics and consolidating the remaining factors into four broad categories; (2) instructing the NCC to publish information about the relevant transportation characteristics rather than a single rating number; and (3) forbidding the NCC from varying the ratings on an article depending on whether it is shipped truckload ("TL"), less than truckload ("LTL"), or "any quantity" ("AQ"). *Id.* at 919.

The Commission based its new approach in part on the Motor Carrier Act of 1980 which encourages competition by easing entry and by stressing individual instead of collective ratemaking. 364 I.C.C. at 910. The four transportation characteristics which the ICC determined were essential to cost-based ratemaking were density, stowability, handling, and liability. These characteristics were all found to be relevant to physical transportability. The four characteristics which the ICC proposed to eliminate were trade conditions, value of service, value per pound, and competition with other commodities. These characteristics were all found to be illegitimate because they had nothing to do with transportability but bore instead upon economic or ratemaking considerations. Subsequently, value per pound was retained because it bore upon carrier liability which the Commission regarded as a transportation characteristic.

The ICC's Interim Decision solicited comments on the proposed classification concept from all interested parties, but it did not provide for cross-service of comments by the parties to this proceeding nor did it allow for the filing of reply comments. The NCC filed comments supporting the 1948 system and opposing the ICC's proposal to use only four transportation characteristics. A survey of subscribers to the NMFC was also conducted by the NCC and allegedly revealed strong user support for the traditional classification system. Although the ICC provided no procedure for filing reply comments, the NCC did obtain some of the comments that were favorable to the ICC's proposed scheme and responded to those comments. On March 9, 1983, the ICC served its decision in this proceeding. 367 I.C.C. 243 (1983).

The March 9 Decision revised portions of the Interim Decision to take into account the comments that were received from the NCC and other carriers and shippers. For example, the Final Decision allowed the NMFC to continue to publish commodity ratings as a composite number since carriers and shippers seemed to agree that elimination of the uniform NMFC rating system would disrupt their present operations. The Final Decision reaffirmed the ICC's adoption of a new streamlined system based on only four transportation characteristics. The Decision also confirmed the abolition of the use of economic or rate-making characteristics as well as the prohibition of differing truckload and less-than-truckload ratings for shipments of a specific commodity. The ICC refused to grant an NCC request for leave to reply to comments filed by the Department of Justice since this would unduly delay a final decision by necessitating the acceptance of other reply comments.

On March 29, 1983, the NCC filed a petition requesting the ICC to reconsider the substance of its decision and requesting that a hearing be held to cover various alleged procedural defects in the Commission's handling of the matter. The defects allegedly arose because the ICC did not provide for cross-service of comments and the filing of replies. In its decision on reconsideration, the ICC denied the NCC's procedural claim, stating that as a rulemaking this proceeding is governed by section

553 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (1982). That section does not require cross-service of comments or the filing of replies and indeed the Commission does not usually allow such a process in its rulemaking proceedings. *See* 49 C.F.R. §§ 1104.12(b), 1110 (1984). In any event, the Commission concluded that the NCC was not prejudiced by its decision to omit cross-service of comments and reply comments and thus rejected its claim.

In reconsidering the substance of the Final Decision, the ICC decided partially to grant the NCC's petition by rescinding its previously ordered ranking of the factors within the new composite "liability" characteristic. On the remaining substantive issues, however, the Commission deadlocked on a two versus two tie vote, and accordingly all other aspects of the Final Decision were left in effect. 367 I.C.C. 715, 717 (1983).

On December 9, 1983, the NCC and the NMFTA filed a petition with this court seeking review of the ICC's final decision.

## II.

Petitioners' first contention is that the ICC mishandled this case procedurally by failing to provide for cross-service of comments, by refusing to accept petitioners' reply comments, and by declining to grant the petitioners' request for a hearing. Petitioners' second claim is that the ICC's elimination of the so-called economic classification factors is an unexplained and unwarranted departure from precedent. Petitioners also disagree with the Commission's view that elimination of these factors is required by the Motor Carrier Act. Finally, petitioners attack the Commission's consolidation of the remaining characteristics into four transportation-related factors. On this point, petitioners challenge the Commission's finding that the new factors are distinct and do not overlap. We address each of these contentions in turn.

### A.

■ Petitioners suggest two bases for their procedural claims, the first statutory and the second constitutional. Turning first to the statutory claim, we must construe several provisions in the Interstate Commerce Act, all of which require a hearing before changes can be made in the classification system.[1] 49 U.S.C. § 10704(a)(1), (b)(1) and (b)(2) (1982). Peti-

---

**1.** The disputed statutory language provides as follows:

When the Interstate Commerce Commission, *after a full hearing,* decides that a rate charged or collected by a carrier for transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title, or that a classification, rule, or practice of that carrier, does or will violate this subtitle, the Commission may prescribe the rate (including a maximum or minimum rate, or both), classification, rule, or practice to be followed. The Commission may order the carrier to stop the violation. When a rate, classification, rule, or practice is prescribed under this subsection, the affected carrier may not publish, charge, or collect a different rate and shall adopt the classification and observe the rule or practice prescribed by the Commission.

49 U.S.C. § 10704(a)(1) (emphasis added).

When the Commission decides that a rate charged or collected by—

(A) a motor common carrier for providing transportation subject to its jurisdiction under subchapter II of chapter 105 of this title by itself, with another motor common carrier, with a rail, express, or water common carrier, or any of them;

(B) a water common carrier for providing transportation subject to its jurisdiction under subchapter III of chapter 105 of this title; or

(C) a freight forwarder for providing service subject to its jurisdiction under subchapter IV of chapter 105 of this title; or that a classification, rule, or practice of that carrier, does or will violate this chapter, the Commission shall prescribe the rate (including a maximum or minimum rate, or both), classification, rule, or practice to be followed.

49 U.S.C. § 10704(b)(1).

(A) When prescribing a rate, classification, rule, or practice for transportation or service by common carriers other than by rail carrier, the Commission shall consider, among other factors, the effect of the prescribed rate, classification, rule, or practice on the movement of traffic by that carrier.

(B) When prescribing a rate, classification, rule, or practice for transportation or service by common carriers other than by rail carrier or motor carrier, the Commission shall consider, among other factors, the need for reve-

tioners argue that the Act entitles them at least to an effective opportunity to respond to the comments of adversary parties even if not to a full hearing. The ICC responds that the Act requires no higher level of process than is provided for by section 553 of the APA which governs informal rulemaking proceedings such as the one at issue in this case. 5 U.S.C. § 553 (1982). We agree with the ICC that section 553 controls the level of process required in this case.

■ On two occasions, the Supreme Court has considered precisely the question of what hearing requirements exist before rules may be promulgated under the statutory scheme at issue here. *United States v. Florida East Coast Ry.*, 410 U.S. 224 (1973); *United States v. Allegheny-Ludlum Steel*, 406 U.S. 742 (1972). In *Florida East Coast*, the Court squarely held that the hearing requirements of current code section 10704 would be satisfied by holding the type of hearing required by section 553 of the APA. The Court reached this conclusion because nothing in the statute sug-

gested that the APA hearing requirement for informal rulemakings was inadequate and because the relevant provision of the Interstate Commerce Act had been considered and amended by Congress since the enactment of the APA. The Court thus held that

reference to [the APA], in which Congress devoted itself exclusively to questions such as the nature and scope of hearings, is a satisfactory basis for determining what is meant by the term "hearing" used in another statute.

410 U.S. at 240. Thus under *Florida East Coast* there is a strong presumption that the procedural guarantees of section 553 of the APA are sufficient unless Congress specifically indicates to the contrary. *See also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519 (1978).

Petitioners offer three distinctions between this case and the Supreme Court decisions in *Allegheny-Ludlum, Florida East Coast*, and *Vermont Yankee*. First,

nues that are sufficient, under honest, economical, and efficient management, to let the carrier provide that transportation or service. 49 U.S.C. § 10704(b)(2).

These sections are derived from former code provision 49 U.S.C. § 316(e) (1976) which was recodified in 1978. The non-substantive 1978 recodification deleted a phrase explicitly requiring a hearing before the ICC could prescribe rates or classifications pursuant to current code § 10704(a)(1), (b)(1) and (b)(2). This phrase was deemed unnecessary given the other hearing requirements in the Act. *See* Historical and Revision Notes to 49 U.S.C. § 10704. The old code provision, 49 U.S.C. § 316(e) (1976) (emphasis added), read as follows:

Any person, State board, organization, or body politic may make complaint in writing to the Commission that any such rate, fare, charge, classification, rule, regulation, or practice, in effect or proposed to be put into effect, is or will be in violation of this section or of section 317. Whenever, *after hearing*, upon complaint or in an investigation on its own initiative, the Commission shall be of the opinion that any individual or joint rate, fare, or charge, demanded, charged, or collected by any common carrier or carriers by motor vehicle or by any common carrier or carriers by motor vehicle in conjunction with any common carrier or carriers by railroad and/or express, and/or water for transporta-

tion in interstate or foreign commerce, or any classification, rule, regulation, or practice whatsoever of such carrier or carriers affecting such rate, fare, or charge or the value of the service thereunder, is or will be unjust or unreasonable, or unjustly discriminatory or unduly preferential or undly (sic) prejudicial, it shall determine and prescribe the lawful rate, fare, or charge or the maximum or minimum, or maximum and minimum rate, fare, or charge thereafter to be observed, or the lawful classification, rule, regulation, or practice thereafter to be made effective and the Commission shall, whenever deemed by it to be necessary or desirable in the public interest, after hearing, upon complaint or upon its own initiative without a complaint, establish through routes and joint rates, fares, charges, regulations, or practices, applicable to the transportation of passengers by common carriers by motor vehicle, or the maxima or minima, or maxima and minima, to be charged, and the terms and conditions under which such through routes shall be operated: *Provided, however,* That nothing in this chapter shall empower the Commission to prescribe, or in any manner regulate, the rate, fare, or charge for intrastate transportation, or for any service connected therewith, for the purpose of removing discrimination against interstate commerce or for any other purpose whatever.

they note that in all three of the Supreme Court cases the issue was whether to grant a full hearing as prescribed by sections 556 and 557 of the APA. In this case, however, no such hearing is being sought since petitioners seek only an opportunity to rebut the evidence offered in opposing comments. Accordingly, petitioners believe the modest procedural safeguards they seek are not foreclosed by Supreme Court decisions on the limited applicability of formal rulemaking procedures. Second, petitioners argue that this case is a hybrid rulemaking-ratemaking initiated by formal notice and that it is also not an open-ended proceeding as was the case in *Florida East Coast.* 410 U.S. at 242. Petitioners claim, therefore, that higher procedural safeguards are called for here because of the Final Decision's effect on particular individuals and because of the hybrid nature of the proceeding. Finally, petitioners distinguish this case from *Vermont Yankee* by claiming that that case dealt only with the impropriety of pure common law additions to APA section 553. Here petitioners claim that *Vermont Yankee* is inapplicable because their constitutional right to due process has allegedly been infringed. Thus, no issue exists in this case as to the source of judicial authority to impose heightened procedural safeguards.

At the outset, we reject petitioners' argument that *Vermont Yankee* concerned only the applicability of the procedures set forth in APA sections 556 and 557. *Vermont Yankee* clearly describes the standard for judicial review in cases like this one which are governed by APA section 553. It indicates that the procedures set forth in that section are not simply a minimum which courts may supplement when seized by a whim. 435 U.S. at 545–49. Rather, "Congress intended that the discretion of the *agencies* and not that of the courts be exercised in determining when extra procedural devices should be employed." *Id.* at 546 (emphasis in original). Under *Vermont Yankee* and *Florida East Coast,* the courts have no authority to supplement the procedural guarantees of section 553 unless Congress has indicated that courts

should do so. Such supplementation threatens to destroy all the "inherent advantages of informal rulemaking," 435 U.S. at 547, while imposing excessive costs from delay and procedural obfuscation. *See generally,* Scalia, *Vermont Yankee: the APA, the D.C. Circuit, and the Supreme Court,* 1978 Sup.Ct.Rev. 345.

We also reject petitioners' argument that special procedures are warranted here because this case is a hybrid ratemaking proceeding which is not open-ended and has some of the elements of a formal rulemaking. We see nothing in *Vermont Yankee, Florida East Coast,* or the APA which would empower us to impose added procedural safeguards in so-called hybrid rulemaking cases. Instead, those decisions clearly indicate that there is no common law of administrative procedure that courts may supplement as they see fit. Hence, the degree of process guaranteed for informal rulemakings is presumptively adequate absent contrary indications of congressional intent or constitutional constraints. In this case, the Supreme Court has already decided that the hearing requirement of section 10704 was not intended to trigger the full procedural safeguards of APA sections 556 and 557. *Florida East Coast,* 410 U.S. at 238. Accordingly, there can be no doubt that only the more limited hearing requirements of section 553 apply.

Our conclusion in this regard is not altered by the fact that in *Florida East Coast* the proceedings were "open-ended" and the Commission had announced its "willingness to consider proposals for modification after operating experience had been acquired." 410 U.S. at 242. Petitioners cite these statements in the Supreme Court's opinion and claim that higher procedural safeguards were available in *Florida East Coast* than in this case. Such statements are irrelevant, however, since APA section 553 imposes no requirement that higher procedural safeguards be available in proceedings that are not "open-ended." In any event, it appears that the proceeding here is as "open-ended" as that in *Florida East Coast.* The Commission is

free to propose and adopt further alterations if problems arise and it has provided an exceptions process for individual carriers that need modification. In other respects, the procedural safeguards available in the present case far exceeded those present in the rulemaking on sixty-days notice which was upheld in *Florida East Coast.*[2]

Nor do we think petitioners' characterization of the ICC's proceeding as a "hybrid" with ratemaking aspects, because transportation classifications affect charges, is sufficient to show that greater procedural safeguards were required. In the sense suggested, all classification decisions would involve, because in some degree they affect, ratemaking. But that sense is far too broad. The actual making of rates comes at a later stage in the process. The proceeding here was not about transportation charges, and it was certainly not an individualized adjudication that might require heightened procedural safeguards. Instead, the decision arrived at was of the generalized, prospective nature that has traditionally caused such proceedings to be treated as rulemakings under the APA. The ICC has followed its own regulations governing rulemakings, and we think that sufficient.

Finally, we think there is nothing to petitioners' argument that the process afforded by APA section 553 deprives them of property without due process of law. Even assuming *arguendo* that petitioners have a constitutionally protected property interest in this case,[3] we nonetheless conclude that any deprivation occurred pursuant to the requirements of due process. We believe it significant: (1) that the Supreme Court up-

held substantially less complete procedural safeguards in its *Florida East Coast* decision than were present in this case; (2) that the ICC gave petitioners three opportunities here to file comments and criticize opposing points of view; (3) that the ICC modified its proposals both in the Final Decision and on reconsideration to take into account petitioners' objections; (4) that petitioners had an opportunity on reconsideration to raise those issues they would have liked to raise in reply comments; (5) that petitioners have not shown that they were prejudiced by the ICC's failure to allow cross-service of comments or reply comments; and finally (6) that the ICC's decision here was procedurally regular in that it met the requirements imposed by 49 C.F.R. §§ 1104.12(b) and 1110 (1984) to govern ICC rulemakings. For all these reasons, we conclude that petitioners were afforded ample procedural safeguards in this case, and we see no constitutional flaw in section 553 as applied to informal rulemakings like the one engaged in here by the ICC.

### B.

Our substantive review of the ICC's decision is guided by well-established legal principles. As the Supreme Court has stated, "we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported." *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. at 749. Unless the Commission's actions were arbitrary and capricious or in excess of its statutory authority, we must approve the proposed rules. *National Small Shipments Traffic Conference v.*

---

**2.** In this case, the Commission gave petitioners three opportunities over two years to file comments and criticize opposing points of view, including an opportunity to raise on reconsideration those issues which might otherwise have been raised in reply comments. In addition, the Commission modified its proposals both in the final decision and on reconsideration to take into account petitioners' objections, and the Commission provided for an exceptions process. In *Florida East Coast,* however, a rulemaking was upheld even though there was only sixty-days notice and one opportunity to file com-

ments. Accordingly, the Commission has clearly provided adequate procedural safeguards in this case.

**3.** Petitioners cite no authorities suggesting that there is a constitutionally protected property interest at stake in this case. We doubt that such an interest is implicated but need not reach the issue, since any deprivation that occurred satisfied the requirements of due process.

*CAB*, 618 F.2d 819, 826 (D.C.Cir.1980). "We may not substitute our judgment for the agency's ... and we must affirm ... if a rational basis for the ... decision is presented." *Id.; Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419 U.S. 281, 290 (1974).

■ In this case, petitioners argue that the elimination of trade conditions, value of service, and competition with other commodities represents an unjustified departure from the Commission's past precedents. Petitioners suggest that the Commission may depart from its precedents only when it explains why its past rationale is being rejected. Recently, we have clarified the burden which an agency faces before it may depart from the status quo. *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1349 (D.C.Cir.1985). As we explained in *Center for Auto Safety*, an agency may adopt new rules *without* affirmatively proving that the status quo is wrong. Instead, it is enough for the agency to establish that "there is no cause to believe that the status quo is right, so that the existing rule has no rational basis to support it." *Id.*

■ Here we find that the Commission adequately demonstrated that the old classification system was inconsistent with the new policy of the Motor Carrier Act of 1980 and was therefore not supported by a rational basis. As the Commission explained, "[c]ompetition is the primary focus under the new law" and accordingly it is desirable to employ a system of cost-based pricing. Ex parte No. MC–98 (Sub-No. 1), *Investigation into Motor Carrier Classification*, 364 I.C.C. 906, 910 (1981). In order to accomplish this, the Commission decided to eliminate the economic or ratemaking factors in the traditional classification scheme. As the Commission stated, none of these characteristics has anything to do with the relative transportability of an article, and they should all therefore be left to the ratemakers. *Id.* at 913. For example, the Commission specifically explained that "competition with other products" is an economic factor since "competitive prod-

ucts are not necessarily of a like character from a transportation standpoint" and "[a] commodity which can be transported at less cost than a competing commodity, should have an advantage in the marketplace with regard to transportation." *Id.* The Commission also fully set forth the grounds for its belief that "trade conditions" and "value of service" should be excluded from the classification since they also have nothing to do with the relative transportability of an article. "Trade conditions and value of service" only "tell the ratemaker how much can be charged without losing the traffic; i.e., 'what the traffic will bear.' "

Petitioners raise several objections to the Commission's reasoning, all of which we find to be without merit. First, petitioners argue that the Commission's decision must be rejected because it breaks with precedent and establishes a novel classification system. Yet the whole purpose of this proceeding was precisely to modify the existing system to take into account the new policy goals of the Motor Carrier Act. The need to depart from precedent was precisely the justification for the proceeding. As the Commission explained, 364 I.C.C. at 910, the Act explicitly requires the Commission "to promote competitive and efficient transportation services" in "regulating transportation by motor carrier." 49 U.S.C. § 10101(a)(2) (1982). Petitioners would have us ignore this explicit statutory mandate mainly because a congressional report praises the classification system as a "useful tool" for the industry. H.R.Rep. No. 1069, 96th Cong., 2d Sess. 28, U.S.Code Cong. & Admin.News 1980, p. 2283 (1980). Yet this statement in no way suggests a congressional intent to prohibit ICC attempts to modify or improve the classification system. Any such intent would be quite surprising when the Commission's proposed modifications so clearly further the statutory goal of promoting efficiency and competition.

Petitioners also complain that the record of this proceeding provides no evidence that economic factors such as trade condi-

tions, value of service, and competition with other commodities vary from territory to territory. Such variance would be significant because it would suggest that these factors are insufficiently uniform to be included in a nationwide classification system. The Commission's decision does indicate, however, an absence of evidence supporting the old classification system with its counter-intuitive assumption that trade conditions and demand for particular commodities are uniform nationwide. Since the old regulatory construct does not appear to be supported by a rational basis, the Commission acted correctly in adopting modifications.

Petitioners' other arguments on this topic do not merit discussion.

### C.

█ Petitioners' final challenge is to the Commission's consolidation of the remaining characteristics into four transportation-related factors. This consolidation was undertaken in part to provide for mutually exclusive and non-overlapping transportation characteristics. Petitioners assert, however, that the new factors are not distinct and overlap as much as did the eleven previous factors which have been replaced. For example, petitioners note that under the Commission's Interim Decision (which introduced these factors) the elements of the new composite density and risk factors must be considered in connection with evaluation of the stowability factor. Accordingly, petitioners claim that the Commission's own rationale for consolidation is thoroughly undermined by its concession that the four new factors are neither separate nor distinct. Petitioners, therefore, ask us to reverse the consolidation.

While we agree with petitioners that some overlap remains in the new four-factor system, it is nonetheless true that the amount of overlap and duplication has been significantly reduced. Accordingly, confusion should be minimized, and the new system should be easier to use. In addition, the Commission has pointed to substantial reasons which support the use of each factor in the new four characteristic system, *see* 364 I.C.C. at 911–13; 367 I.C.C. at 248, while we are not given any specific reasons that would support the retention of certain of the old factors. Since the new system is simpler and focuses on the transportation characteristics of a commodity, the Commission was properly hesitant to require the use of additional characteristics or factors absent a showing that each additional characteristic conveyed valuable, additional information. No such showing was made, and the Commission's proposed simplification received substantial public support. If in practice it appears that the four characteristics overlap too much or are insufficiently distinct as petitioners claim, the Commission can always propose a further simplification. In the meantime, we are persuaded that the Commission's use of the four characteristic system is supported by a rational basis.

### III.

We have carefully examined petitioners' three claims of legal error, and we are persuaded that the Commission's decision should be affirmed in all respects. The new classification system will promote cost-based ratemaking while leaving individual carriers free to accommodate economic considerations by tailoring their rates individually. In addition, an exceptions process is provided whereby individual carriers can obtain modifications to the extent necessary. For all these reasons, we conclude that the Commission acted legally, and we therefore affirm its Final Decision.

*So ordered.*