NATIONAL CLASSIFICATION COMMITTEE and National Motor Freight Traffic Association, Inc., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission.

No. 84–1140.

United States Court of Appeals, District of Columbia Circuit.

Argued March 19, 1985.
Decided Dec. 17, 1985.

---

John R. Bagileo, with whom William W. Pugh and Brian L. Troiano, Washington, D.C., were on brief, for petitioners.

Sidney L. Strickland, Jr., Atty., I.C.C., with whom William F. Baxter, Asst. Atty. Gen., Dept. of Justice, Robert S. Burk, Acting Gen. Counsel, Henri F. Rush, Acting Deputy Gen. Counsel, I.C.C., Robert B. Nicholson and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.

Before WALD, EDWARDS and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge.

This is the third in a series of petitions to this court relating to the question of whether petitioners, the National Classification Committee ("NCC") and the National Motor Freight Traffic Association, Inc. ("NMFTA") may include charges in their freight classification tariff, the National Motor Freight Classification ("NMFC"). This latest petition is from the Interstate Commerce Commission's summary denial of petitioners' application to amend the provisions of their rate bureau agreement to include authority to formulate and publish charges in the NMFC.

Petitioners challenge the Commission's decision on the grounds that they were not afforded their statutory right to a hearing on the application and that the record and findings supporting the decision are inadequate so that the decision is arbitrary, capricious and without a rational basis. We affirm the Commission's decision.

## I.

The procedural history of this case was set out in our decision in *National Classification Committee v. United States*, 746

F.2d 886 (D.C.Cir.1984).[1] Here we present only those facts that are directly relevant to this petition.

The agreement petitioners seek to amend was approved by the Commission in 1956 pursuant to former section 5a of the Interstate Commerce Act, recodified as amended at 49 U.S.C. § 10706 (1982). *See National Classification Committee—Agreement*, 299 I.C.C. 519 (1956). The agreement governs freight classification matters for the approximately 3,000 motor common carriers who are parties to the agreement and "establishes a code of procedure which enables applicants to utilize an effective means for joint consideration, initiation, and establishment of classification matters." *Id.* at 522. The Commission's approval of the agreement confers antitrust immunity on any collective activities covered by the agreement. *See* 49 U.S.C. § 10706(b)(2) (1982).

The purpose of the agreement is to assist various groups of motor common carriers or individual carriers in ratemaking, thus obviating the need for publication of millions of separate rates for articles transported through interstate commerce. This goal is achieved through the use of two complementary tariffs, the freight classification tariff and the class rate tariff. The freight classification tariff assigns commodities with comparable transportation characteristics to a class. *See National Classification Committee v. United States*, 765 F.2d 1146 (D.C.Cir.1985). Once a commodity has been assigned to a class, the class rate tariff is used to determine the rate for transporting an article between various origins and destinations. The freight classifications are published by petitioner NMFTA, and the class rate tariffs are published by regional rate bureaus and by individual carriers.

On May 5, 1978, the NMFTA proposed to publish in the NMFC an extra charge of $2.00 per shipment on "order notify" ship-

---

1. Citations to the record in this case are designated as "No. 83-1474 J.A." Citations to the record in the case before us are designated as "J.A."

ments weighing 10,000 pounds or less.[2] The Commission suspended the operation of the proposed schedules and instituted an investigation into their lawfulness. By decision served on January 9, 1979, the Commission cancelled the proposed schedules, concluding that the NMFTA had not shown the proposed charge to be reasonable in amount and, further, that the collective establishment of an order-notify charge was beyond the scope of the approved section 5a agreement. *Investigation and Suspension Docket No. M–29788—Charge for Shipments Moving on Order Notify Bills of Lading, N.M.F.T.A.* (served Jan. 9, 1979), *reprinted in* No. 83–1474 J.A. at 246a (*"Order-Notify I"*).

On review, this court affirmed the Commission's decision that the order-notify charge was not shown to be just and reasonable, but found the record inadequate for review of the issue "whether the Interstate Commerce Commission's determination that this type of charge cannot properly be included within the scope of a Section 5A agreement is reasonable under all the circumstances." *National Classification Committee v. ICC,* No. 79–2561, mem. op. at 1 (D.C.Cir.Dec. 16, 1980). The court found the record inadequate because the Commission did not adequately set forth the factual and policy basis for its decision:

> There is, for example, no discussion by the Commission indicating the extent to which its decision affects similar charges ... which already are included within the agreement as approved; nor is there any explanation of the apparent inconsistency between the inclusion of such charges and the exclusion of a charge for order-notify shipments. The Commission's decision on the scope of .the agreement clouds the legitimacy of these and similar charges and the Commission must clarify with adequate factual and legal analysis its position indicating what types of order-notify or other special charges are

deemed appropriate or inappropriate under the Section 5A agreement.

*Id.* at 1–2.

Upon remand, the Commission reopened the proceeding and issued a notice in which it solicited comments and stated in broad terms its understanding of the court's mandate:

> By this decision, we are reopening this proceeding for consideration of the lawfulness of the promulgation of order-notify charges and any other charges as part of the National Motor Freight Classification Tariff.... The lawfulness of order-notify charges cannot be considered in a vacuum; the entire subject of charges *per se* must be addressed.

*Investigation and Suspension Docket No. M–29788—Charge for Shipments Moving on Order-Notify Bill of Lading, N.M.F. T.A.* at 3 (served Mar. 12, 1982), *reprinted in* No. 83–1474 J.A. at 351a, 353a.

After reviewing the comments received, and the entire section 5a agreement, on March 22, 1983, the Commission issued its decision on remand. *Investigation and Suspension Docket No. M–29788—Charge for Shipments Moving on Order-Notify Bill of Lading, N.M.F.T.A.* (served Mar. 22, 1983), *reprinted in* No. 83–1474 J.A. at 589a (*"Order-Notify II"*). The Commission concluded first that the order-notify charge exceeded the scope of the section 5a agreement, and second, that the NCC published other rules and charges in the classification tariff which exceeded the scope of the agreement. The Commission concluded:

> We do not question the NCC's authority to promulgate rules and regulations.... We question respondent's authority to promulgate charges in the context of rules that are intended to govern the classification. Under section 5a, motor carriers could enter into agreements to consider both rates and charges, provided these powers were specified in an

---

**2.** "An order-notify shipment is one in which a carrier, upon its issuance of a negotiable, order-notify bill of lading, becomes obliged to retain possession of the goods shipped until the origi-

nal bill is surrendered to it prior to delivery." *National Classification Committee v. United States,* 746 F.2d at 888.

agreement approved by the Commission. Respondent's agreement is specific as to classification and silent as to rates and charges. This silence cannot be circumvented by placing rates and charges in rules governing the classification.

No. 83–1474 J.A. at 591a. Finally, the Commission did not limit its findings to the particular issue presented but, in what the Commission described as its response to the court's remand order, concluded its decision with a section entitled "Commission Policy." *Id.* at 596a. This section was intended by the Commission to "clarify definitively what is appropriate matter for inclusion within the NMFC," and was intended to establish a standard for ongoing proceedings with respect to proposed amendments to the section 5a agreement. *Id.* The statement provides in relevant part:

> Accordingly, we conclude that for now and in the future, NCC's substantive antitrust immunity is limited to the promulgation of classifications and rules and regulations relating to the classification. Rules and charges, other than those prescribed by us, that do not contribute to the actual establishment, implementation and/or understanding of the classification exceed the scope of respondent's antitrust immunity and must be expunged from the NMFC.

*Id.* at 596a–597a.

This court affirmed the Commission's *Order-Notify II* decision in *National Classification Committee v. United States,* 746 F.2d 886 (D.C.Cir.1984). The court first determined that the critical issue presented in the case was "the scope and purpose of the NMFC agreement," *id.* at 891, and then affirmed the Commission's interpretation of the agreement: "We will not interfere with the Commission's determination of what constitutes a true classification matter when that determination is, standing alone and unaided by judicial deference, reasonable, and in fact, compelling. The decision that accessorial charges and minimum charges may be stricken from the agreement is thus affirmed." *Id.* at 892.

On July 5, 1983, while the *Order-Notify II* decision was pending on appeal, the NCC filed an application that proposed to add language to the NMFC authorizing the NCC to consider and establish charges. The proposed amendment essentially would have added the word "charges" where the powers and functions of the NCC, the National Classification Review Subcommittee, and the National Classification Board are enumerated. The NCC's application stated that "[t]he purpose of the proposed amendment is to insure that the NCC will retain its ability to consider and establish certain rule-related charges." J.A. at 3a. The NCC contended that the amendment was necessary to "lay to rest certain concerns evidenced in the [*Order-Notify II* proceeding].... that the consideration and voting on charges by the NCC was precluded by the ICC's own jurisdictional limitations. With the approval of the sought amendment specifically authorizing the NCC to consider and establish charges, there would be no doubt that rules relating to such charges are also authorized." *Id.* at 7a.

On January 4, 1984, the Commission denied the application finding that it was in effect a collateral attack on the Commission's *Order-Notify II* decision. J.A. at 16a–17a. On January 24, 1984, NCC petitioned the Commission to reopen the proceeding, arguing that the application could not be interpreted to be a collateral attack on the *Order-Notify II* decision because the application "raises *only* the issue of whether it would be appropriate to grant the NCC authority to publish charges in the future." *Id.* at 22a (emphasis in original). In contrast, the issue presented in *Order-Notify II* was "whether the publication of a proposed charge on order notify shipments *is presently* authorized by the NCC's *existing* Section 5a agreement." *Id.* at 20a (emphasis in original).

In its decision of February 16, 1984, the Commission conceded that the application was not a collateral attack on the *Order-Notify II* decision and reopened the proceeding on the existing record. The Commission, however, denied the application to

amend the section 5a agreement. *Section 5a Application No. 61, National Classification Committee—Agreement* (served Feb. 16, 1984), *reprinted in* J.A. at 27a–31a.

The Commission first noted that the reasons submitted by the NCC as support for its application to amend had fully been considered in the *Order-Notify II* decision and that "[t]he same legal and policy reasons expressed in that decision cause us to conclude, in direct response to the petition to reopen, that the NCC should not be permitted to amend its rate bureau agreement to authorize it to publish rules and charges unrelated to classification." J.A. at 28a. The Commission restated the rationale advanced in the *Order-Notify II* decision as the basis for its decision to deny petitioners' application:

> The primary basis for our conclusion is our long standing recognition of the principle that classification should be kept entirely separate from rates and revenues. *Western Classification Case*, 25 I.C.C. 442, 453 (1912)....

> The factors controlling transportability upon which classification is based do not vary from region to region.... The factors controlling the establishment of charges and rates (costs and even more importantly, the competitive environment) on the other hand, are quite different and do vary from region to region and carrier to carrier.

> Because costs vary from territory to territory and carrier to carrier there is no compelling reason why there should be uniform nationwide charges, unless the public interest warrants their prescription. Rather, charges should be subjected to the same competitive forces that govern individual carrier and rate bureau ratemaking decisions.

*Id.* at 29a–30a.

## II.

On appeal, petitioners advance both procedural and substantive arguments. They contend that the Commission's decision to proceed on the existing record denied them their statutory right to a hearing on their application to amend. Petitioners challenge the substantive validity of the decision by arguing that: (1) the Commission's decision is inconsistent with the applicable law; (2) there is no basis in the record for the Commission's findings: (3) the Commission has failed adequately to explain the departure from its past practice of permitting the publication of charges in the NMFC; and, (4) the Commission has failed adequately to explain its departure with respect to motor carriers from its present practice of permitting authorization for the publication of charges in the railroads' agreement.

### A.

The Commission is said to have violated petitioners' statutory right to a hearing by denying their application without providing notice to interested parties or an opportunity to comment on the application. While we agree that petitioners are entitled to a hearing under the relevant statute, we conclude that petitioners have been given the fullest opportunity required by law to present their arguments on the issues presented in their application.

Although the current statutory provision governing ratemaking agreements provides only that "[t]he Commission may begin a proceeding under this section on its own initiative or on application," 49 U.S.C. § 10706(g) (1982), the predecessor statute, former section 5a, explicitly provided that "[n]o order shall be entered under this section except after interested parties have been afforded reasonable opportunity for hearing." Interstate Commerce Act, § 5a(8), as added, ch. 491, 62 Stat. 472, 473 (1948). Because the legislative history shows that no substantive change was intended by the recodification, *see* H.R.Rep. No. 1395, 95th Cong., 2d Sess. 4, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3009, 3013, petitioners are entitled to a "hearing" on their application. *See Central & Southern Motor Freight Tariff Association v. United States*, 757 F.2d 301, 313 (D.C. Cir.1985).

■ This determination does not, however, as petitioners suppose, end our analysis. Petitioners' application to amend the agreement did not occur in a vacuum but instead came after a proceeding so closely related that the issues presented in each are nearly identical in substance. We are not required to ignore this prior proceeding and to adopt a stultifyingly formalistic interpretation of the statutory mandate. A hearing is required only when it would serve some purpose. *See Denver Union Stock Yard Co. v. Producers Livestock Marketing Association,* 356 U.S. 282, 287, 78 S.Ct. 738, 741, 2 L.Ed.2d 771 (1958) ("we never presume that Congress intended an agency 'to waste time on applications that do not state a valid basis for a hearing' ") (*quoting United States v. Storer Broadcasting Co.,* 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1081 (1956)); *Independent Bankers Association of Georgia v. Board of Governors of the Federal Reserve System,* 516 F.2d 1206, 1220 (D.C.Cir.1975) ("when it can serve absolutely no purpose ... denial of a hearing may be proper even though adjudicatory proceedings are provided for by statute"). Although we are not "unmindful of the cardinal importance of the right to be heard where one's interests are acutely affected by the actions of an administrative agency," *National Broadcasting Co. v. FCC,* 362 F.2d 946, 953 (D.C.Cir.1966), it is clear that "the right of opportunity for hearing does not require a procedure that will be empty sound and show, signifying nothing." *Citizens for Allegan County, Inc. v. FPC,* 414 F.2d 1125, 1128 (D.C.Cir.1969). When a party has had an opportunity to address essentially the same substantive issues, and to present identical arguments in a prior related proceeding, the hearing requirement has been satisfied. Under these circumstances we will not require the agency to "rehear" the issue by accepting evidence which it already has before it. As we have previously held in this regard, "[w]e do not believe that the Commission should be required to write, as it were, on a

*tabula rasa....* It does not have to remain oblivious to all that has gone before or ignore its own earlier actions and the evidence which justified those actions." *National Broadcasting Co. v. FCC,* 362 F.2d at 955.

■ The issue presented, then, is whether petitioners were given the opportunity in the *Order-Notify II* proceeding to address the issues presented in their application to amend the agreement, or whether some argument or presentation has been omitted because of the Commission's decision to proceed on the existing record. Petitioners argue that they were entitled to a hearing on the application because the issue presented in *Order-Notify II* involved an interpretation of the original agreement and the issue presented here is whether that agreement may be amended to authorize the promulgation of charges. Reply Brief for Petitioners at 8. We agree that as a technical matter these are not the same issues. But the distinction is without a difference with respect to the hearing requirement. The central and overriding issue in each case is whether petitioners *should* be permitted to include charges in the classification. There is no question that the existing agreement does not include the term "charges." Thus, in *Order-Notify II* petitioners necessarily argued that the classification should be interpreted to include charges and, thus, that charges should be permitted in the classification. In this action, by seeking to amend the agreement to include the term "charges," petitioners are again simply arguing that the classification should include charges. Because the identical substantive issue is presented in each case, all arguments with respect to the application to amend the agreement could have been, and should have been, presented in the *Order-Notify II* proceeding and petitioners were not entitled to a second opportunity to present the same arguments.

We are certain that petitioners have suffered no prejudice from the Commission's

actions here because the record is replete with evidence that petitioners were clearly aware that the *Order-Notify II* proceeding was not limited to the interpretation of the language of the existing agreement but also involved the question of the propriety of including charges in the classification. In their petition to the Commission for receipt of new evidence, petitioners explained that it was their "intent to place before the Commission all relevant and material matters regarding the history and relationship of rule-related charges of general application to the classification, the appropriateness of the inclusion of such charges within that tariff, and the necessity that such charges be contained and continued within the classification." No. 83–1474 J.A. at 333a. In their opening comments in the *Order-Notify II* proceeding, petitioners explicitly acknowledged that the Commission was "considering the question of whether, notwithstanding past authorization, the NCC's agreement *should* include the collective establishment of charges," *id.* at 392a (emphasis added), and then proceeded to argue that the Commission was required to approve any proposed amendment to the agreement that fulfills the requirements of the Act, *id.* at 393a—the same issue presented in this proceeding. Thus, any argument that petitioners were not aware that the underlying issue in the *Order-Notify II* proceeding was whether the classification should include charges is without merit.

Our conclusion that petitioners were given the fullest opportunity in the *Order-Notify II* proceeding to address the issues presented here is also supported by the fact that petitioners have presented virtually the same arguments here and, further, as sole support for their application to amend the agreement, petitioners listed the six arguments which were raised in the *Order-Notify II* proceeding. *See* J.A. at 4a–5a.

Petitioners simply have not shown that there is any argument relevant to this proceeding which could not have been raised in the *Order-Notify II* proceeding. We thus agree with the Commission that given the procedural history of this and related proceedings, petitioners were provided with the fullest opportunity to present their views and that further comment was neither required nor necessary.

### B.

■ Our role upon review of the substantive validity of the Commission's decision is limited. We must affirm the Commission's decision unless we find that it is arbitrary and capricious or in excess of the Commission's statutory authority. *National Small Shipments Traffic Conference, Inc. v. CAB*, 618 F.2d 819, 826 (D.C. Cir.1980). We must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). But "[w]e may not substitute our judgment for the agency's ... and we must affirm ... if a rational basis for the ... decision is presented." *National Small Shipments Traffic Conference, Inc. v. CAB*, 618 F.2d at 826; *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974).

### 1.

■ Petitioners claim that the Commission's decision is inconsistent with the governing statute. Pursuant to the Interstate Commerce Act, the Commission must approve an agreement that meets certain requirements, *see* 49 U.S.C. § 10706(b)(3) (1982), "unless the Commission finds that such agreement is inconsistent with the transportation policy set forth in section 10101(a)" of the Act. 49 U.S.C. § 10706(b)(2) (1982). Section 10101(a)(2) requires the Commission "to promote competitive and efficient transportation services."

49 U.S.C. § 10101(a)(2) (1982). The Commission in its decision denying petitioners' application to amend the agreement considered the national transportation policy and concluded that the amendment would be inconsistent with that policy. The primary basis for this conclusion is that because costs vary from region to region, rates and revenues should be kept separate from classification which, in contrast, is based on characteristics that do not vary regionally. J.A. at 29a. For this reason, the Commission concluded:

> Because costs vary from territory to territory and carrier to carrier there is no compelling reason why there should be uniform nationwide charges, unless the public interest warrants their prescription. Rather, charges should be subjected to the same competitive forces that govern individual carrier and rate bureau ratemaking decisions.

*Id.* at 30a. Thus, the Commission considered the national transportation policy, articulated its findings, and provided a rational explanation for its conclusion that uniform nationwide charges would not "promote competitive and efficient transportation services." That is all the statute requires.

### 2.

Petitioners also contend that because the Commission failed to provide an opportunity for a hearing, there is not a "scintilla of evidence" in the record to support the conclusion that the factors affecting rates and charges vary regionally. Brief for Petitioners at 19.

It is beyond dispute that an agency may provide the factual predicate for a finding by taking "official notice" of matters of common knowledge, *see Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio*, 301 U.S. 292, 301, 57 S.Ct. 724, 729, 81 L.Ed. 1093 (1937) (notice "that there has been a depression, and that a decline of market values is one of its concomitants" is appropriate), of evidence available to it from other proceedings, *Moss v. FPC*, 502 F.2d 461, 465 (D.C.Cir.1974), *rev'd in part on other grounds*, 424 U.S. 494, 96 S.Ct. 1003, 47 L.Ed.2d 186 (1976), and of matters known to the agency through its cumulative experience and consequent expertise. *National Tour Brokers Association v. ICC*, 671 F.2d 528, 533 (D.C.Cir.1982); *Bonnaffons v. U.S. Department of Energy*, 646 F.2d 548, 555 (Temp.Emer.Ct.App. 1981); *General Telephone Co. of the Southwest v. United States*, 449 F.2d 846, 862 (5th Cir.1971). *Cf. NLRB v. Seven-Up Bottling Co. of Miami, Inc.*, 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953). The agency cannot, however, rely on data known only to the agency: "when an agency takes official or administrative notice of facts, a litigant must be given an adequate opportunity to respond." *Heckler v. Campbell*, 461 U.S. 458, 469, 103 S.Ct. 1952, 1958, 76 L.Ed.2d 66 (1983); *see United States Lines, Inc. v. Federal Maritime Commission*, 584 F.2d 519, 534–35 (D.C. Cir.1978).

Whether it is a matter of common knowledge, or of agency experience and expertise, we believe that it is clear that the Commission may take official notice that factors affecting rates—specifically costs and the competitive environment—are not uniform nationwide. If such factors did not vary by region, motor carriage would be strikingly different from all other industries. Because this fact was specifically addressed in the *Order-Notify II* decision, *see* No. 83–1474 J.A. at 595a, 595a–596a, the Commission has also given petitioners an adequate opportunity to address the finding. It is irrelevant that petitioners did not choose to contest it in that proceeding; it is enough that they had an "adequate opportunity to respond." Petitioners' complaint will not be heard now simply because they chose not to avail themselves of the opportunity provided by the Commission. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. at 288–89 n. 4, 95 S.Ct. at 443 n. 4.

3.

■ Petitioners' argument that the Commission's decision is an irrational radical departure from its past practice of allowing charges to be included in the classification is also without merit. It is well settled that an agency may depart from past policies or practices if the agency also provides a reasoned explanation for its actions. *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 289 (D.C.Cir.1981); *Commonwealth of Pennsylvania v. ICC,* 590 F.2d 1187, 1196 (D.C.Cir.1978). In this regard, "an agency may adopt new rules *without* affirmatively proving that the status quo is wrong. Instead, it is enough for the agency to establish that 'there is no cause to believe that the status quo is right, so that the existing rule has no rational basis to support it.' " *National Classification Committee v. United States,* 765 F.2d at 1153 (*quoting Center for Auto Safety v. Peck,* 751 F.2d 1336, 1349 (D.C.Cir.1985)) (emphasis in original).

Here, and in *Order-Notify II,* the Commission explained that it had in the past rejected petitioners' agreement because it contained non-classification matters, *see National Motor Freight Traffic—Agreement,* 292 I.C.C. 45, 52 (1954), and that subsequent inclusion of the non-classification related charges was permitted due to the Commission's inadvertence and not to Commission approval of the practice. Thus, it is not clear that the Commission has, in fact, departed from a "long-standing policy." Further, the Commission has given an adequate explanation for its conclusion that charges should no longer be permitted in the classification. As the Commission stated, because the factors affecting rates vary regionally, they should not be included in a classification tariff which would permit rates of uniform nationwide applicability, but instead should be subject to the same competitive forces as other rates and charges. Thus, the Commission has adequately explained its departure from the status quo; the Commission has reasonably concluded that the practice of including rates in the classification is inconsistent with the national transportation policy, and thus that the practice lacks a rational basis.

4.

■ Finally, petitioners contend that the Commission's attempt to distinguish the rail classification from the motor classification is both without record support and without a rational basis.

The contention of lack of record support does not survive the observation that the Commission, which is charged with review of the railroads' rate bureau agreement, may take official notice of the contents of, and practices attendant to, that agreement. Nor was a new hearing on this question required, since these facts, too, were specifically addressed in the *Order-Notify II* decision, *see* No. 83–1474 J.A. at 595a–596a, and petitioners had the opportunity to contest them. Turning to the rationality of the Commission's distinction, it is common ground that an agency may adapt its regulatory policies to the facts of a particular case when the action is based upon "reasoned distinctions." *American Trucking Associations v. ICC,* 697 F.2d 1146, 1150 (D.C.Cir.1983). As a plurality of the Supreme Court has said, "[t]hose factual differences serve to distinguish the cases only when some legislative policy makes the differences relevant" and in this regard "it is enough to satisfy the requirements of judicial oversight of administrative action if the agency asserts distinctions that, when fairly and sympathetically read in the context of the entire opinion of the agency, reveal the policies it is pursuing." *Atchison, T. & S.F. Ry. v. Wichita Board of Trade,* 412 U.S. 800, 808–09, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) (plurality opinion).

In response to petitioners' argument that the Rail Uniform Classification Committee ("UCC") is permitted to publish charges in the Uniform Freight Classification, the Commission explained that the rail classifi-

cation can be distinguished on several grounds. First, the railroads' agreement specifically states that the UCC is authorized to publish charges as well as rates. J.A. at 30a. Second, the UCC does not, in practice, promulgate rates of uniform nationwide applicability without regard to regional rate variations, but instead these matters are actually decided by regional rate bureaus who simply notify the UCC to publish the proposal in the tariff. *Id.* Finally, the Commission noted that the railroads may be prohibited from publishing charges in the future as a result of the Commission's present review of the railroads' agreement. *Id.* at 31a.

The first of the proffered grounds seems inadequate as a reason not to allow motor carriers to amend their agreement so that it contains the authorization the railroads have. The third would be problematical unless the Commission committed itself to apply the same criteria to the railroad agreement. But the second, and seemingly primary, rationale supports the Commission's distinction. The fact that *regional* rate bureaus actually determine the rates under the railroads' agreement reveals to the court the policies which are being pursued. The application of those policies to the motor carriers, which seek to set some charges on a nationwide basis despite regional variations in costs and competition, requires that their application to amend the NMFTA be denied.

The Commission's decision is

*Affirmed.*