914 F.2d 290
 286 U.S.App.D.C. 234
 The OFFICE OF THE CONSUMERS' COUNSEL, STATE OF OHIO, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Panhandle Eastern Pipe Line Co., Citizens Gas & Coke
Utility, East Ohio Gas Co., Indiana Gas Co., Inc.,
Association of Businesses Advocating
Tariff Equity, Panhandle
Customer Group, Intervenors.
 No. 89-1261.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 12, 1990.
Decided Sept. 18, 1990.
 
 Margaret Ann Samuels, with whom Thomas W. Atzberger and Loretta B. Looper, were on the brief, for petitioner.
 Timm L. Abendroth, Atty., F.E.R.C. ("FERC"), with whom Joseph S. Davies, Deputy Solicitor, F.E.R.C., was on the brief, for respondent. Jill Hall, Atty., F.E.R.C., also entered an appearance for respondent.
 
 
 1
 Raymond N. Shibley, with whom Lawrence G. Acker, Frank R. Lindh, and Judy M. Johnson were on the brief, for intervenor Panhandle Eastern Pipe Line Co. Bruce W. Neely, also entered an appearance for intervenor Panhandle.
 
 
 2
 William P. Diener and Steven M. Sherman entered appearances for intervenor Citizens Gas & Coke Utility.
 
 
 3
 Carolyn Y. Thompson and Richard D. Avil, Jr., entered appearances for intervenor East Ohio Gas Co.
 
 
 4
 Ronald E. Christian and Tomm Rattray entered appearances for intervenor Indiana Gas Co., Inc.
 
 
 5
 Glen S. Howard entered an appearance for intervenor Association of Businesses Advocating Tariff Equity.
 
 
 6
 Richard M. Merriman, John R. Schaefgen, Jr., and Randall V. Griffin, entered appearances for intervenor Panhandle Customer Group.
 
 
 7
 Before BUCKLEY, WILLIAMS, and D.H. GINSBURG, Circuit Judges.
 
 
 8
 Opinion for the court filed by Circuit Judge BUCKLEY.
 
 BUCKLEY, Circuit Judge:
 
 9
 The Office of the Consumers' Counsel of the State of Ohio seeks review of two orders of the Federal Energy Regulatory Commission approving purchased gas adjustment filings of the Panhandle Eastern Pipe Line Company. Petitioner claims that the Commission erred in reviewing certain of Panhandle's gas purchasing practices exclusively under a fraud and abuse standard, when it should have applied a prudence standard as well. Petitioner asserts that under the latter standard, Panhandle's wellhead and fixed supply purchasing practices would be deemed imprudent under the Natural Gas Act. Moreover, it claims that the wellhead prices paid by Panhandle were excessive, in violation of the abuse standard of the Natural Gas Policy Act; that Panhandle imprudently purchased gas from a pipeline affiliate, in violation of the Natural Gas Act; and that Panhandle's dealings with a producer affiliate violated the affiliated entities test of the Natural Gas Policy Act.
 
 
 10
 Petitioner's argument that the Commission applied the wrong standard was not urged before the Commission in an application for rehearing and is thus not properly before this court. The Commission's findings of no abuse with respect to Panhandle's purchases of wellhead gas and fixed supply gas were reasonable and supported by substantial evidence. We are less confident of its finding of no non-comparable treatment under the affiliated entities test with respect to purchases from its producer affiliate, but find reasonable its conclusion that the public interest would not be served by ordering further discovery. As we conclude that there is insufficient evidence to support the Commission's finding that Panhandle's purchases from a pipeline affiliate were prudent, we grant the petition for review with respect to that portion of the Commission's decision.
 
 I. BACKGROUND
 A. Regulatory Framework
 
 11
 The Federal Energy Regulatory Commission regulates the rates charged by pipelines on sales of natural gas in interstate commerce. Pursuant to section 4 of the Natural Gas Act ("NGA"), the Commission is charged with ensuring that rates for such gas will be "just and reasonable." 15 U.S.C. Sec. 717c(a) (1988). The Commission has established a cost-of-service approach for determining whether a pipeline's rates meet that standard. If it finds that a pipeline's costs of acquiring and transporting gas were prudently incurred, it will allow the pipeline to recover such costs, along with a reasonable return on investment. See Office of Consumers' Counsel of Ohio v. FERC, 783 F.2d 206, 213 (D.C.Cir.1986) ("OCC I "). In Commission practice, costs are deemed to be prudent if they are those
 
 
 12
 a reasonable utility management ... would have made, in good faith, under the same circumstances, and at the relevant point in time.
 
 
 13
 New England Power Co., 31 F.E.R.C. p 61,047, at 61,084 (1985), aff'd sub nom. Violet v. FERC, 800 F.2d 280 (1st Cir.1986).
 
 
 14
 Generally, the reasonableness of the costs incurred by a pipeline is presumed, unless a protestant raises a serious doubt about them, in which case the pipeline must establish the prudence of its expenditures. Midwestern Gas Transmission Co., 30 F.E.R.C. p 61,260, at 61,542-43 (1985). Rather than performing a full review pursuant to section 4 of the NGA for every change in rates, the Commission has created a procedure whereby pipelines may file a special "purchased gas adjustment" ("PGA") every six months reflecting changes in the cost of gas purchased by them, which will in turn be reflected in an adjustment in the rates charged its customers. See 18 C.F.R. Sec. 154.301-.310 (1990).
 
 
 15
 The Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. Secs. 3301-3432 (1988), partially deregulated the wellhead prices of natural gas. Section 107 of the Act makes special provision for "high-cost natural gas," as defined in subsection (c), permitting such gas to be sold (subject to a statutory maximum) at prices reflecting the higher costs and risks of production. 15 U.S.C. Sec. 3317. The NGPA also eliminated the Commission's jurisdiction over certain categories of "first sales" of gas (e.g., wellhead purchases by a pipeline), 15 U.S.C. Sec. 3431(a)(1), and imposed statutorily defined maximum lawful prices for gas. Id. Sec. 3312-3319. Although the NGPA leaves rates generally subject to review for prudence under the NGA, it creates an exception in the case of first sale gas purchase costs.
 
 
 16
 Thus section 601 of the NGPA provides that the price a pipeline pays for gas at the wellhead will be deemed just and reasonable so long as it is below the statutory maximum, 15 U.S.C. Sec. 3431(b)(1)(A), and the Commission cannot deny the pass-through of such costs unless they are found by the Commission to be excessive "due to fraud, abuse, or similar grounds." Id. Sec. 3431(c)(2). A protestant seeking to deny the pass-through of costs arising from gas purchased from producers must show that they were affected by some fraud or abuse.B. Procedural Background
 
 
 17
 The instant proceedings stem ultimately from overestimations on Panhandle's part of its future gas supply needs as well as the likely market price of such gas. Responding to projections of a protracted shortage of natural gas supplies, coupled with steady increases in prices and demand, Panhandle began executing long-term contracts in September 1981 for the purchase of natural gas, including higher priced "section 107 gas." Furthermore, a significant proportion of its purchase agreements contained "fixed supply" or "must take" clauses that required Panhandle to accept all the gas that the producers would be able to deliver from designated sources. Beginning in 1982, however, Panhandle's sales and gas prices generally weakened in comparison with previous estimates; and because of its extensive commitments to higher-priced sources, Panhandle was unable to take advantage of the cheaper gas that began to flood the market as a result of new discoveries stimulated by deregulation.
 
 
 18
 In order to pass through these costs, Panhandle made two PGA filings, on January 16 and July 17, 1984, that are the subjects of these proceedings. After petitioner and other parties protested the rate increases, the Commission suspended the adjusted tariffs pursuant to section 4(e) of the NGA, 15 U.S.C. Sec. 717c(e), making them effective on March 1, subject to refund. Panhandle Eastern Pipe Line Co., 26 F.E.R.C. p 61,252 (1984). The Commission ordered a hearing on the rates before an Administrative Law Judge ("ALJ"). Panhandle Eastern Pipe Line Co., 26 F.E.R.C. p 61,339 (1984). In this hearing order, FERC set for argument the issues of fraud and abuse under the NGPA, imprudence under the NGA, and whether certain sales volumes estimates related to the PGA requests were reasonable. Id. at 61,740.
 
 
 19
 On February 6, 1986, the ALJ issued his initial decision. Panhandle Eastern Pipe Line Co., 34 F.E.R.C. p 63,055 (1986). In it, the ALJ considered the protestants' objections to Panhandle's following purchasing practices:
 
 
 20
 (1) Panhandle contracted to purchase more expensive section 107 gas when it knew, or should have known, that future demand would not be sufficient to justify this action and that this practice was both imprudent under the NGA and abusive under the NGPA, especially in light of Panhandle's failure to protect itself with "market-out" clauses in its gas purchase contracts, which would have permitted it to decline gas at above-market prices;
 
 
 21
 (2) By failing to exercise a right to reject tenders of fixed supply gas provided for in certain of its contracts, Panhandle had purchased excessive amounts of such gas, thereby increasing its average costs;
 
 
 22
 (3) Panhandle violated the prudence standard of the NGA by taking excessive amounts of gas from its pipeline affiliate, Trunkline Gas Company, when cheaper gas was available; and
 
 
 23
 (4) Panhandle violated the affiliated entities test of section 601(b)(3)(E) of the NGPA by giving its producer affiliate, Anadarko Production Company, certain preferential treatment and terms.
 
 
 24
 Id. at 65,185-98. The ALJ concluded that these practices were neither abusive under the NGPA nor imprudent under the NGA. Id.
 
 
 25
 On review, the Commission affirmed the ALJ. Panhandle Eastern Pipe Line Co., 44 F.E.R.C. p 61,246 (1988) ("Opinion 313 "). Although the Commission agreed with the ALJ's results in all respects, it, unlike the ALJ, thought that the prudence standard was inapplicable to the first and second practices complained of and that only the abuse standard applied. In the case of the section 107 purchases, the Commission found that "[s]ince that gas was purchased in first sales, the abuse standard of NGPA section 601(c)(2) is the applicable standard for determining whether Panhandle can be denied pass through of those costs." Id. at 61,905. On analyzing these purchases under the fraud and abuse standard, the Commission decided that two forecasts by the Ad Hoc Joint Committee, a group made up of Panhandle and its cusMtomers,, reasonably predicted increased demand throughout the 1980's and a shortfall of up to 382 billion cubic feet ("Bcf") by 1990. See Id.
 
 
 26
 With regard to the allegations concerning the lack of market-out clauses in Panhandle's contracts, the Commission concurred with the ALJ's finding that contracts without such clauses were still quite common during the relevant time period. Id. at 61,906. In addition, it concluded that in light of this and other factors, including a provision in virtually all of Panhandle's section 107 contracts giving it a limited right to stop all purchases if the parties could not agree on a renegotiated price, the Commission could not find that its contracts were less favorable than those of other pipelines. Id.
 
 
 27
 With respect to the so-called fixed sources of supply, the protestants contended before the ALJ that Panhandle's obligations to take 100 percent of certain types of gas, such as casinghead gas and plant gas, constituted an excessive proportion of Panhandle's total gas purchases during the relevant period. Moreover, they claimed that Panhandle could have reduced costs by earlier exercise of its right, under certain of its contracts, to reject tenders of these "must take" gases. The Commission determined, however, that these purchasing practices were not abusive under the NGPA, as there was no evidence as to what percentage of its fixed supply contracts contained tender refusal rights and none to indicate that their earlier exercise would have significantly reduced the amount of "must take" gas under contract to Panhandle. Id. at 61,908.
 
 
 28
 Moving to the protestants' third objection, the Commission acknowledged that Panhandle's purchases from its affiliate Trunkline had had the effect of increasing the average price of the Panhandle system's gas by about 21 cents per thousand cubic feet ("Mcf"), adding about $25 million to the cost of its gas during the relevant period. See id. at 61,909. It was also clear that one reason Panhandle chose to make discretionary purchases from Trunkline rather than secure cheaper supplies from its other suppliers was to assist Trunkline with its serious take-or-pay problems. Id.
 
 
 29
 The Commission analyzed this issue, unlike the first two, under the prudence rather than the fraud and abuse standard because Panhandle's purchases from Trunkline were not first sales of gas. Id. at 61,911. Despite applying this more demanding standard, the Commission found that Panhandle's practices were prudent. Id. at 61,912. The Commission noted that Panhandle depended on Trunkline to supply that portion of its gas needs over and above the 1.5 Bcf per day that Panhandle could obtain from its other suppliers and that without Trunkline's long-term contractual obligation to provide it with up to 750,000 Mcf per day, Panhandle could not have met its own peak demands. The Commission found that under these circumstances it was reasonable for Panhandle to conclude that helping to preserve Trunkline's financial health in order to maintain their contractual relationship was in the best interests of Panhandle's customers. Id.
 
 
 30
 Finally, the protestants claimed that Panhandle's purchases from Anadarko violated the affiliated entities test of section 601(b)(1)(E) of the NGPA, 15 U.S.C. Sec. 3431(b)(1)(E), as there were some concessions that Panhandle had won from other suppliers that were not made part of its contracts with Anadarko. The Commission disagreed, finding that there was no obligation for an affiliate to accede to the most favorable terms accepted by a nonaffiliated supplier. 44 F.E.R.C. at 61,915.
 
 
 31
 The Office of the Consumers' Counsel of the State of Ohio ("OCC") applied for rehearing before the Commission. In its motion for rehearing, OCC claimed as error only the merits of the Commission's findings. Significantly, its motion did not specifically list as error the Commission's application of only the abusive standard to the first two practices. On February 22, 1989, the Commission denied rehearing but granted OCC's motion for clarification, essentially reaffirming its previous findings. Panhandle Eastern Pipe Line Co., 46 F.E.R.C. p 61,189 (1989) ("Opinion 313-A "). OCC then filed this petition for review.
 
 II. DISCUSSION
 
 32
 OCC argues that FERC improperly limited the scope of its proceedings by applying only the NGPA's fraud and abuse standard to Panhandle's gas purchases. It also argues that the Commission reverted to use of the "significant adverse consequences" requirement for a finding of abuse, a requirement that has been rejected by this court. See OCC I, 783 F.2d at 222-23 (Commission may not limit denial of pass-through to situations where pipeline's abusive conduct has "significant adverse effect" on customers). OCC repeats the objections to the Commission's substantive conclusions that it had argued both before the Commission and the ALJ. The Commission responds that both it and the ALJ carefully weighed the record evidence and determined that Panhandle's purchasing practices violated neither the NGA nor the NGPA. It also argues that it properly applied only the fraud and abuse standard to the section 107 purchases and fixed supply costs, as these involved first sales of gas.
 
 
 33
 Even if there is an open question as to whether only the fraud and abuse standard should apply to the purchases of section 107 and fixed supply gas, the question is not properly before us. Section 506 of the NGPA requires that a petitioner must set forth before the Commission in an application for rehearing the specific grounds on which error is alleged:
 
 
 34
 No objection to [an] order of the Commission shall be considered by the court if such objection was not urged before the Commission in the application for rehearing unless there was reasonable ground for the failure to do so.
 
 
 35
 15 U.S.C. Sec. 3416(a)(4). Section 19 of the NGA has a substantially identical provision. 15 U.S.C. Sec. 717r(b). While petitioner's motion for rehearing broadly charged that Panhandle's purchases were imprudent, it did not specifically urge the Commission to consider the charge that it erroneously restricted review to the fraud and abuse standard. Petitioners cannot preserve an objection indirectly. See Panhandle Eastern Pipe Line Co. v. FPC, 324 U.S. 635, 645, 65 S.Ct. 821, 826, 89 L.Ed. 1241 (1945). Thus we do not address this claim.
 
 
 36
 Accepting the standards applied by the Commission, we further note that both section 506 of the NGPA and section 19 of the NGA also provide that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 15 U.S.C. Secs. 717r(b), 3416(a)(4). Accordingly, we must consider whether there was substantial evidence to support the Commission's determination that (1) the section 107 and fixed supply purchases were not abusive (there being no allegation of fraud), (2) the purchases from Trunkline were prudent, and (3) the purchases from Anadarko did not violate the affiliated entities test of section 601(b)(1)(E).
 
 A. Section 107 and Fixed Supply Purchases
 
 37
 The Commission has stated that it will find abuse where a pipeline evidences a reckless disregard of its duty to provide service at the lowest reasonable cost consistent with the maintenance of adequate service. Columbia Gas Transmission Corp., 39 F.E.R.C. p 61,219 (1987). An earlier test for abuse, which included the additional requirement of "significant adverse consequences" on customers, see Columbia Gas Transmission Corp., 26 F.E.R.C. p 61,034, at 61,100 (1984) ("Opinion 204 "), was rejected by this court in OCC I. 783 F.2d at 222. We approved, however, the "reckless disregard" component of the Commission's test. Id. at 219-22.
 
 
 38
 On examining Opinion 313 and Opinion 313-A, we find no indication that the question of significant adverse consequences was considered by the Commission, hence we reject petitioner's argument that it should be reversed on that ground. We conclude, moreover, that the record contains substantial evidence to support the Commission's finding that Panhandle did not show reckless disregard with respect to its section 107 and fixed supply purchases. The Commission noted in its decision that Panhandle reasonably relied on the 1981 Ad Hoc Joint Committee forecast of gas requirements. These showed a steady growth in customer demand of 1.08 percent per annum for the 1981-1990 period, accompanied by the expectation of rising energy costs. Opinion 313, 44 F.E.R.C. at 61,905. In these circumstances, the Commission found it reasonable for Panhandle to undertake purchases of the more expensive section 107 gas in order to be assured of meeting its anticipated demand.
 
 
 39
 Petitioner claims, nonetheless, that Panhandle was reckless in failing to negotiate immediately exercisable market-out clauses, which would have permitted Panhandle to escape some of its purchase obligations when the market became soft. The Commission found, however, that about fifty percent of the contracts negotiated during the relevant period did not have market-out clauses, and Panhandle did take the precaution of including price redetermination provisions in its section 107 gas purchase agreements. Id. at 61,906. Thus we conclude that this finding was supported by substantial evidence.
 
 
 40
 The result is much the same with respect to the fixed source of supply purchases. The Commission found no evidence that Panhandle's exercise of its right to reject certain tenders of casinghead gas would have significantly diminished its must-take obligations. Moreover, the Commission noted in its rehearing order that several of Panhandle's fixed supply obligations were undertaken in the context of various supplemental projects Panhandle had entered into in order to increase its production base and that petitioner had not challenged the propriety of these projects. Opinion 313-A, 46 F.E.R.C. at 61,630. We therefore find the Commission's determination with respect to these purchases to be supported by substantial evidence.
 
 B. Trunkline Purchases
 
 41
 The Commission correctly concluded that the Trunkline purchases were subject to the NGA's prudence standard, which calls for a broader inquiry than that required under the NGPA's fraud and abuse test. See Opinion 204, 26 F.E.R.C. at 61,098-99. The Commission, however, has not adequately explained why the Trunkline purchases were prudent. It concedes that Panhandle could have reduced its purchases from Trunkline from 300,000 Mcf per day to 208,000 Mcf per day during the relevant period, with cost savings of $25 million. Opinion 313, 44 F.E.R.C. at 61,909. Moreover, it is uncontested that by making these purchases from Trunkline, Panhandle incurred some take-or-pay liability from other suppliers that it would not have otherwise incurred. Id.
 
 
 42
 In light of these uncontested facts, the Commission's mere assertion that Panhandle had an interest in "sustain[ing] this valuable long term source of supply," id. at 61,912, is insufficient. There is no evidence in the record to indicate what would have happened to Trunkline, and then to Panhandle, if purchases from the former had been held to 208,000 Mcf per day; nothing, in fact, to support the Commission's claim that Panhandle's costly assistance to Trunkline was a prudent management decision. The Commission emphasizes the fact that Trunkline "enabled Panhandle to emerge from the curtailments of the 1976-1980 era more quickly than most other pipelines." Id. This alone, however, is obviously not evidence that the Panhandle purchases were prudent.
 
 
 43
 The Commission also suggests that Panhandle might have helped Trunkline reduce its take-or-pay liability in order to reduce Panhandle's own liability down the road, on the apparent premise that it would be more costly for Panhandle to absorb the pass-through of Trunkline's take-or-pay liabilities than to pay its own on the alternative gas it failed to take. See id. We have found nothing in the record to support such a surmise. Again, this is Commission speculation, not substantial evidence. We therefore find that the Commission's conclusions are not supported by substantial evidence.
 
 C. Anadarko Purchases
 
 44
 Section 601(b)(1)(E) of the NGPA requires that to be deemed just and reasonMable,, any amount paid in a first sale between an interstate pipeline and an affiliated company must "not exceed the amount paid in comparable first sales between persons not affiliated with such interstate pipeline." 15 U.S.C. Sec. 3431(b)(1)(E) (emphasis added). The Commission has interpreted "comparable first sales" to include sales by non-affiliates to the applicant pipeline as well as such sales to other pipelines. El Paso Natural Gas Co., 23 F.E.R.C. p 61,216, at 61,448-51 (1983).
 
 
 45
 In applying this standard to the purchases from Anadarko under the three contracts specifically challenged by petitioner, the Commission concluded that there was no evidence in the record that these transactions violated the affiliated entities rule. Opinion 313, 44 F.E.R.C. at 61,914. In each instance, the Commission was able to point to terms in contracts between Panhandle and non-affiliated producers that were comparable to those that had been cited as evidence of favoritism towards Anadarko. For example, the Commission rejected petitioner's claims that Panhandle favored Anadarko with advantageous terms on several stripper well gas purchases, pointing to evidence that three other non-affiliated entities enjoyed the same conditions. Id. at 61,915. It nevertheless concluded that "there is no evidence which goes to whether the sales at issue here are comparable." Id.
 
 
 46
 While the Commission also concedes that Anadarko received more favorable treatment than some other producers, it rightly declined petitioner's proposal that it adopt the rule that an interstate pipeline must require its affiliate suppliers to accept "the most favorable terms that the pipeline has negotiated with a non-affiliated supplier." Id. It seems self-evident that an affiliate need not be the least-favored supplier in order to satisfy the section 601 comparability test.
 
 
 47
 Although relevant evidence is admittedly sparse, we believe that on net balance it supports the Commission's conclusion that petitioner had failed to demonstrate favoritism. By the same token, FERC acknowledged that Panhandle had failed to prove comparability. Given the de minimis amounts involved in the challenged contracts (approximately $500,000 out of a universe measured in the many hundreds of millions), we conclude that the Commission acted well within its discretion in finding that the public interest would not be served by reopening the proceedings for further discovery. Id. at 61,915.
 
 III. CONCLUSION
 
 48
 The Commission found that Panhandle's section 107 purchases and its fixed supply costs were not abusive, and this finding is supported by substantial evidence. While there is insufficient evidence to evaluate fully the Commission's application of the affiliated entities test, the amounts at issue do not warrant further discovery. As the Commission's treatment of the Trunkline purchases is not supported by substantial evidence, however, we grant the petition for review and remand the case to the Commission for further proceedings consistent with this opinion.
 
 
 49
 So ordered.