Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 23, 2004       Decided April 6, 2004

No. 03-1026

WISCONSIN POWER & LIGHT COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

STATE OF WISCONSIN AND
UNITED STATES DEPARTMENT OF THE INTERIOR,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Michael C. Griffen* argued the cause and filed the briefs for petitioner.

*Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*Ronald M. Spritzer*, Attorney, U.S. Department of Justice, argued the cause for intervenor United States Department of the Interior. With him on the brief was *Andrew C. Mergen*, Attorney. *Mary A. Thurston*, Attorney, entered an appearance.

*Peggy A. Lautenschlager*, Attorney General, Attorney General's Office of the State of Wisconsin, and *Philip Peterson*, Assistant Attorney General, were on the brief for intervenor State of Wisconsin.

Before: RANDOLPH, ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Concurring opinion filed by *Circuit Judge* RANDOLPH.

ROGERS, *Circuit Judge*: In exercising judicial review under § 313(b) of the Federal Power Act ("FPA"), 16 U.S.C. § 825*l*(b), the court is again confronted with the unusual statutory configuration where, in granting hydroelectric licenses, the Federal Energy Regulatory Commission is obligated both to conduct its own environmental assessment to protect and enhance fish and wildlife and to include such prescription conditions for fishways as the Secretary of the Interior may direct. *See* 16 U.S.C. §§ 803(j), 811. Wisconsin Power and Light Company ("WP&L") petitions for review of Commission orders placing conditions on its license as a result of the Secretary's prescription. Essentially, WP&L contends that the Secretary's prescription is unsupported by substantial evidence. Although WP&L did not argue on rehearing before the Commission with the specificity presented in its brief on appeal, because we conclude, in light of the statutory scheme, that there was a "reasonable ground for failure so to do" under FPA § 313(b), the court has jurisdiction to address the merits of WP&L's petition. Upon so doing, we conclude that WP&L's challenges to the Secretary's prescription conditions lack merit and that any challenge it may have to potential costs of fishway devices is not ripe.

**I.**

FPA § 10(j) provides that "in order to adequately and equitably protect, mitigate damages to, and enhance, fish and wildlife (including related spawning groups and habitat) affected by the development, operation, and management of the project, each [hydroelectric] license issued . . . [by the Commission] shall include conditions for such protection, mitigation, and enhancement." 16 U.S.C. § 803(j)(1). However, regardless of what conditions the Commission may or may not include in a license, FPA § 18 provides that "the Commission shall require the construction, maintenance, and operation by a licensee at its own expense of . . . such fishways as may be prescribed by the Secretary of the Interior or the Secretary of Commerce, as appropriate." *Id.* at § 811. Both provisions were at issue in the proceedings before the Commission involving WP&L's license application.

The Prairie du Sac Hydroelectric Project ("the project") is a twenty-nine megawatt dam located on the Wisconsin River in south-central Wisconsin about ninety miles upstream of the Mississippi River. *See Wisconsin Power & Light Co.*, 99 FERC ¶ 62,225 at 64,514 ¶ 1 (2002) ("Initial Order"). It was constructed and initially operated pursuant to a fifty year federal permit, which expired in 1961. *See Wisconsin Power & Light Co.*, 52 FERC ¶ 62,294 (1990), *reh'g denied*, 55 FERC ¶ 61,169 (1991). After the Commission determined in 1990 that the project must be licensed, *see id.*, WP&L applied for an original license to continue to operate and maintain the project. Notice of the application was published on August 11, 1994, and on December 31, 1996, notice issued that the application was ready for environmental analysis. *See* Initial Order at 64,514 ¶ 2. In 1997, the Secretary of the Interior, for the Fish and Wildlife Service, and in collaboration with the Wisconsin Department of Natural Resources ("the Department"), submitted recommended license conditions pursuant to FPA § 10(j). The Secretary also requested that any license include a provision reserving the Secretary's § 18 authority to prescribe the construction, operation, and maintenance of appropriate fishways at the project. The Commission issued a final environmental assessment on November 8,

2000. In January 2002, the Secretary and the Department called the Commission's attention to the recent removal of four dams opening up an additional 120 miles of river upstream of the project and providing substantial spawning and foraging habitat for riverine fish, and reiterated their § 10(j) recommendations that upstream fish passage facilities be installed at the project.

On June 27, 2002, the Commission granted WP&L a thirty year license for the project subject to conditions. The license included most § 10(j) recommendations, with the exception of those concerning fish passage. Rejecting the recommendations of the Secretary and the Department, the Commission did not include conditions in the license requiring WP&L to make provision for the upstream movement of fish around the dam or to take measures to protect fish from injury when traveling downstream through the project. The Commission, adopting a staff report, found no evidence of an effect on fish populations due to turbine mortality or fish entrainment, whereby fish enter the project's water intakes and pass through its generating turbines, and therefore declined to require the installation of "expensive protection devices." *Id.* at 64,515 ¶ 14. The Commission likewise determined that, because of the "dubious chance for success" and high construction costs, measures were not required to permit fish to travel upstream around the dam. *Id.* at 64,516 ¶ 19. Instead, the Commission recommended that WP&L develop a plan in consultation with the Secretary and the Department to identify specific measures to enhance fishery and other aquatic resources in the project's vicinity. While concluding the fishways would not be in the public interest, the Commission stated that "should new information in the future indicate a different finding," the Secretary's § 18 prescription authority was reserved. *Id.*

The Secretary and the Department requested rehearing, citing new information and changed circumstances, and the Secretary resubmitted her fishways recommendations as a § 18 prescription. The new information related to recent research on additional passage strategies applicable to the project, and the changed circumstances related to the remov-

al of four upstream dams after the Commission had concluded its environmental assessment. The Commission included the prescription as conditions in the license and dismissed the rehearing requests as moot. *See Order on Rehearing and Amending License*, 101 FERC ¶ 61,055 (2002) ("Amended License Order"). Among other things, the amended license required WP&L, in coordination with the Secretary and the Department, to: install within one year fish protective devices to prevent fish from entering the turbines; complete within one year a detailed engineering and biological study of fishway alternatives at the dam, including identifying and detailing the costs of a proposed solution to allow fish passage; design, build, test and refine within three years the fishway approved by the Secretary and the Department; and incorporate within one year thereafter any fishway refinements found necessary by the Secretary and the Department. *Id.*

WP&L sought rehearing of the Amended License Order on the ground that the Commission inadequately explained the reversal of its Initial Order. In the request for rehearing, WP&L argued that there was no reasoned basis for the Commission's imposition of additional conditions in the amended license, and that no record evidence demonstrated the need for fish-protective devices. Even if circumstances had changed since the Commission completed its environmental assessment, WP&L argued, the Commission had erred by failing to consider cost and technical issues in amending the license. The Commission denied rehearing because "[t]he Commission has no authority to amend or reject a Section 18 prescription that is timely filed." *Order Denying Rehearing*, 101 FERC ¶ 61,338 (2002) ("Rehearing Order").

WP&L petitions for review of the Commission's orders on the ground that the Secretary's prescription was arbitrary and capricious because the record fails to show that fish entrainment at the project has an adverse effect on fishery resources, that the prescribed entrainment protective devices are technically feasible, would be effective, and survive a cost-benefit analysis, and that the fish species the Secretary seeks to protect would use or benefit from the prescribed upstream fish passage facilities.

**II.**

As a threshold matter, the Secretary challenges the jurisdiction of the court to consider WP&L's challenge to the Secretary's fishways prescription. Because WP&L, according to the Secretary, did not argue in its request for rehearing by the Commission that the Secretary's § 18 conditions are not supported by substantial evidence, but instead claimed only that the Commission had failed to justify the change from its original decision not to impose fishway conditions, the Secretary maintains that the court may not consider the contentions presented in WP&L's brief.

FPA § 313(b) provides in pertinent part that "[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 16 U.S.C. § 825*l*(b). This court strictly construes the jurisdictional requirement that such objections must be specific. *See Office of the Consumers Counsel, State of Ohio v. FERC*, 914 F.2d 290, 295 (D.C. Cir. 1990); *Town of Norwood v. FERC*, 906 F.2d 772, 774 (D.C. Cir. 1990). Although the court seldom finds reasonable grounds for failure to raise specifically objections before the Commission prior to raising them on judicial review, *see Public Service Co. of New Mexico v. FERC*, 863 F.2d 1021, 1022–23 (D.C. Cir. 1988) (rehearing en banc denied), WP&L's petition presents an "extraordinary situation" where such reasonable grounds existed. *See Public Service Co. of New Mexico v. FERC*, 857 F.2d 833, 836 (D.C. Cir. 1988); *cf. ASARCO, Inc. v. FERC*, 777 F.2d 764, 774 (D.C. Cir. 1985).

In *Bangor Hydro–Electric Company v. FERC*, 78 F.3d 659 (D.C. Cir. 1996), the court held that FPA § 18 mandates inclusion of the Secretary's fishway prescriptions as a condition of the Commission's license. *See also American Rivers v. FERC*, 201 F.3d 1186, 1210 (9th Cir. 2000); *Wisconsin Pub. Serv. Corp. v. FERC*, 32 F.3d 1165, 1170–71 (7th Cir. 1994) ("*WiscPSC*"); *Lynchburg Hydro Assocs.*, 39 FERC ¶ 61,079, at 61,218 (1987); *cf. Escondido Mut. Water Co. v. La*

*Jolla Band of Mission Indians*, 466 U.S. 765, 778 n.21 (1984). The court also held that while the Commission is the proper party to be named as respondent, the Commission has no authority to review the Secretary's prescription and instead acts as a neutral forum responsible for compiling the record for judicial review. *See Bangor*, 78 F.3d at 662. At most, if the Commission determines that a license as conditioned should not issue, it can refuse to license a project. *See id.* at 663; *cf. Escondido*, 466 U.S. at 778 n.20. It followed that once the Commission issues a license containing the Secretary's prescription, the challenge to the prescription occurs in the court of appeals, and not before the Commission on rehearing. *See Bangor*, 78 F.3d at 663; *cf. Escondido*, 466 U.S. at 778 n.21.

Under the interpretation of the statutory scheme adopted in *Bangor*, 78 F.3d at 662–63, where a party seeks to challenge the Secretary's § 18 prescription, as opposed to a determination that the Commission has authority to review, the request for rehearing by the Commission is a mere formality necessitated by FPA § 313(b). In order to preserve its right to judicial review, then, WP&L had to apply for rehearing, but it did not have to develop its objections with the usual specificity that is required under FPA § 313. *Compare Motor & Equipment Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998). Doing so would have been useless because the Commission could not review the Secretary's prescription. The fact that WP&L's rehearing request was succinct does not affect the court's jurisdiction over WP&L's petition for review based upon the administrative record before the Commission. Although the rehearing request focused on the Commission's failure to examine the administrative record underlying the Secretary's prescription, it also stated that there was a lack of record evidence to support the § 18 conditions imposed in the amended license. Conceivably, the Commission could have responded to the rehearing request by inviting the Secretary to supplement the administrative record. *Cf. Bangor*, 78 F.3d at 662. But at this stage of the proceedings it is too late to pursue that alternative. In *Bangor*, the court declined to remand to allow

the Secretary to supplement the administrative record, and also denied the Secretary's motion to add to the record before the court because Congress intended that the Secretary's prescription be supported based on the record before the Commission "as would any other Commission licensing requirement." *Id.*; *see* 18 C.F.R. § 4.34(b)(1).

Accordingly, because FPA § 313(b) contemplates situations in which the court will review matters not presented to the Commission, we hold in light of the statutory scheme that WP&L had "a reasonable ground" for failing to set forth its objections to the Amended License Order in its request for rehearing by the Commission with the specificity that is customarily required. We therefore turn to the merits of WP&L's challenge to the Secretary's prescription as set forth in the Amended License Order.

### III.

FPA § 313(b) provides that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 16 U.S.C. § 825*l*(b). The statute implicitly invokes the familiar arbitrary and capricious standard. *See Bangor*, 78 F.3d at 663 & n.3. Thus, in seeking to have the court declare the Secretary's prescription to be arbitrary or capricious, WP&L bears a heavy burden. *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 714 (D.C. Cir. 2000). The court may not substitute its judgment for that of the Secretary, and must consider only "whether the [Secretary's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), bearing in mind that " '[s]ubstantial evidence' means more than a 'scintilla,' but less than a preponderance of the evidence." *Burns v. Director, Office of Workers Comp. Programs*, 41 F.3d 1555, 1562 n.10 (D.C. Cir. 1994). The court, accordingly, must sustain the Secretary's prescription if it is "consistent with law and supported by the evidence presented to the Commission, either by the Secretary or other interested parties." *Escondido*, 466 U.S. at 778

n.20. In a prescription case, "it is the Secretary's, and not the Commission's, judgment to which the court is giving deference." *Id.* at 778.

In contending that the Secretary's prescription for upstream fish passage was arbitrary and capricious, WP&L focuses on the Secretary's 1997 statement that, as regards turbine mortality of fish, "biological significance is not the primary issue," but rather that "project operation results in the mortality of important fishery resources, which are the property of the State of Wisconsin." WP&L contends that the record lacks substantial evidence to support the proposition that fishery resources have economic value, and implicitly maintains that any prescription based on an unsupported rationale is arbitrary and capricious. But WP&L confuses the rationale provided by the Secretary in 1997 for recommendations to the Commission pursuant to FPA § 10(j), 16 U.S.C. § 803(j), which obligates the Commission to include license conditions that protect and enhance fish and wildlife, with the revised rationale applicable to the Secretary's § 18 prescription. In any event, the Secretary's 1997 recommendations proffered further rationales that are supported by substantial record evidence, such as that "reestablishing upstream and safe downstream passage around the [project] for paddlefish would help considerably to preclude the need for the [Fish and Wildlife Service] to formally list this species on the Federal list of threatened and endangered species and would help considerably to allow this species to be removed from the State list." And, although the Secretary's 2002 prescription incorporated by reference her 1997 recommendations, the prescription provided further justifications for the new requirements, namely to provide for "safe, timely, and effective fish passage," as well as the protection of threatened species.

Moreover, that the protection and conservation of fishery resources underlies the Secretary's § 18 prescriptions need not be proved in every such prescription, for Congress has made clear that the purpose of § 18 is to provide for "safe and timely" fish passage, *see* Pub. L. 102–486, § 1701(b), 106 Stat. 3008 (1992), as well as other "fish and wildlife benefits

both downstream and upstream of a project." H.R. Conf. Rep. No. 99–934, at 23 (1986). Furthermore, the Secretary issued a comprehensive plan that has been accepted by the Commission pursuant to FPA § 10(a), 16 U.S.C. § 803(a). The plan identifies the Secretary's commitment to protect the quality and quantity of the nation's recreational fisheries that she has found to be socially and economically significant. *See* Fisheries USA: The Recreational Fisheries Policy of the U.S. Department of the Interior Fish and Wildlife Service at 4–5, *available at* http://policy.fws.gov/a1npi89_25.pdf. To serve these goals requires restoration or enhancement of depleted or declining fisheries, such as exist at the project. Hence, the Secretary need not establish whether fishery resources warrant protection as a general proposition, but rather must provide substantial evidence to show that fishery resources will be adversely affected by a particular project as well as to support the particular solutions for protecting those resources.

WP&L contends for the first time on appeal, however, that the Secretary is bound by a regulation of the Commission to the rationale and evidence provided for the prescription in her initial comments in 1997. *See* 18 C.F.R. § 4.34(b)(1). Although this contention is raised in WP&L's reply brief, *see City of Nephi v. FERC*, 147 F.3d 929, 934–35 (D.C. Cir. 1998), the contention is flawed in any event. The Commission's regulation requires the Secretary to present her prescription as part of her "initial comments filed with the Commission," 18 C.F.R. § 4.34(b)(1), but it does not limit the Secretary's § 18 prescription to the state of knowledge and circumstances at the time of her initial comments. Nor has the Commission so construed it. The Initial Order, while concluding that a fishway or rehabilitation of the navigation lock would not be in the public interest, provided that "should new information in the future indicate a different finding," the Secretary's prescription authority was preserved, as is only sensible where, as here, a license extends thirty years into the future. Moreover, in enacting legislation to reform Commission procedures for the issuance of hydroelectric project licenses, Congress left intact Commission authority to modify licenses:

"The Committee believes that the Commission should have authority to ensure that licenses reflect current information concerning the need to protect fish and wildlife. The legislation does not change existing law, including case law, governing FERC authority to modify licenses during their term." H.R. Rep. No. 99–507, at 32 (1986) (House Committee on Energy and Commerce report on Electric Consumer Protection Act of 1986); *see Department of the Interior v. FERC*, 952 F.2d 538, 547 (D.C. Cir. 1992).

WP&L also contends that substantial evidence is lacking to support the Secretary's prescription because the administrative record cites to studies that were not formally submitted to the Commission and in some instances were not specifically identified. This contention fails for two reasons: WP&L relies on a misunderstanding of the information on which the Secretary may properly rely and ignores the record addressing the prescriptions and establishing that the Secretary did not act arbitrarily or capriciously. Firstly, the substantial evidence standards normally applicable to review of the Commission's orders apply to the findings of the Secretary. *See Bangor*, 78 F.3d at 662, 663; *cf. Escondido*, 466 U.S. at 778. Under our precedents, the Secretary could properly take official notice of matters of common knowledge, of evidence available to her from other proceedings, and of matters known to the agency through its cumulative experience and consequent expertise. *See Nat'l Classification Comm. v. United States*, 779 F.2d 687, 695 (D.C. Cir. 1985). Where a matter primarily involves a question of fact, the Secretary may rely on her expertise, even where there is conflicting evidence. *See Wisconsin Valley Improvement Co. v. FERC*, 236 F.3d 738, 746–47 (D.C. Cir. 2001). The Secretary may rely on publicly available information so long as it is referenced, thereby enabling "meaningful adversarial comment and judicial review;" such material need not be directly introduced into the record. A footnote is enough. *See U.S. Lines v. Federal Maritime Comm.*, 584 F.2d 519, 534–35 & 534 n.44 (D.C. Cir. 1978) (citing *City of Chicago v. FPC*, 458 F.2d 731 (D.C. Cir. 1971)). However, the Secretary may not

rely on data known only to the agency. *Nat'l Classification Comm.*, 779 F.2d at 695.

The record before the Commission meets this standard because it was appropriate, given the paucity of site-specific information as a consequence of WP&L's resistance to studies at the project, for the Secretary to cite relevant, publicly available studies, which need not have been introduced into the record. Insofar as the Secretary mentioned studies not specifically cited for given propositions but that were included in attached bibliographies, the studies that were cited with particularity constitute substantial evidence sufficient to support the Secretary's prescription. For example, the Commission's final environmental assessment established that turbine mortality rates at the project could range up to twenty percent, therefore showing the need for entrainment protection devices; the report of WP&L's consultant indicated that several entrainment protection devices may be effective at the project and warrant further study; a Department report demonstrated that enabling upstream passage around the dam would help to reestablish the threatened paddlefish to its traditional habitat on the upper reaches of the Wisconsin River; a 1932 study proved that operation of the project's navigation lock facilitated upstream fish passage; and the Secretary's request for rehearing cited research demonstrating that new prototype fishways had successfully enabled passage of fish species found at the project. In sum, the Secretary's reference to other studies for which no detailed footnotes were provided served merely to bolster, and does not detract from, the independent sufficiency of substantial evidence that was properly cited or introduced into the record.

Secondly, in contending that there is not substantial evidence to show that fish entrainment at the project has an adverse effect on fishery resources, WP&L ignores record evidence, including that in its license application. An analysis provided by the Department to WP&L in response to a draft of the license application indicated that thirty-four percent of walleye tagged above the dam were recovered below it. Because the dam is a complete barrier to upstream fish

movement, the Department stated that "those fish are forever lost to the [above-dam] lake fishery." In addition, the Commission's environmental assessment of the project estimated turbine mortality for small fish at four to six percent, and for large fish, such as walleye, at ten to twenty percent. The Commission concluded that "[t]he total number [of] fish entrained may be greater than at most sites because of the greater hydraulic capacity" of the project powerhouse.

WP&L nonetheless maintains that the record permits no conclusions about entrainment and turbine mortality at the project because only one study, which did not directly evaluate entrainment, was done at the project. The record shows that further studies at the project were not completed because WP&L rescinded its proposal to do so, despite its consultant's acknowledgment that such studies were "justified." The applicable standard of review does not demand perfect information, but only requires substantial evidence, *see* 16 U.S.C. § 825*l*(b), which may include findings made in light of uncertainty. *See Department of the Interior*, 952 F.2d at 546. Under the circumstances, the Secretary reasonably relied on data from facilities similar to the project in concluding that entrainment was harming fishery resources.

WP&L additionally contends that record evidence fails to show that the Secretary's downstream passage prescriptions are technically feasible and effective. The Commission's environmental assessment cast doubt on certain entrainment protective devices, such as a mesh net. However, the Secretary could reasonably rely on the more favorable assessment contained in WP&L's application as well as recent research at similar facilities. Given conflicting views, the Secretary had "discretion to rely on the reasonable opinions of [her] own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). For instance, the Secretary reasonably credited WP&L's license application, which, based on its consultant's detailed research and analysis, stated that "WP&L believes the net would protect a large percentage of fish now susceptible to entrainment." The Secretary also noted a 2001 study demonstrating

the effectiveness of other devices at preventing the entrainment of lake sturgeon, one of the species of concern at the project. From this evidence the Secretary could reasonably conclude that the downstream passage prescriptions were feasible and would be effective.

With regard to the upstream passage prescription, WP&L similarly identifies record material evidencing doubts about whether the prescribed fishways are technically feasible and would be effective. The Commission's environmental assessment concluded in 2000 that "based on the analyses done to date, . . . there is no technically feasible means to provide upstream fish passage at Prairie du Sac dam, particularly for the primary species of concern." However, the Secretary's prescription relied on evidence, which was not available at the time of the Commission's environmental assessment, that refuted the Commission's conclusion that a fishway would not be effective for target species like lake sturgeon. Moreover, a 1932 study, which the Commission failed to credit, contradicted the Commission's hypotheses; the study showed that a then-operable, preexisting navigation lock at the project permitted thousands of fish from a wide range of species, including sturgeon, to bypass the dam. WP&L's license application also included a 1993 study that concluded that threatened "[p]addlefish would probably enter the Prairie du Sac dam lock if it were operational." Based on such substantial evidence, the Secretary reasonably concluded that upstream passage facilities would be effective.

Lastly, WP&L contends that prescription of entrainment protective devices potentially requiring expenditure of a "huge sum" for a "questionable return" constitutes arbitrary and capricious action by the Secretary. In its view, "the cost of any downstream fish protection facilities would far outweigh any benefit to fish or fisheries in the Wisconsin River." Petitioner's Br. 20. Such a prescription, WP&L maintains, cannot be "consistent with law" or "reasonably related to [its] goal." *Bangor*, 78 F.3d at 663 (citing *Escondido*, 466 U.S. at 778 & n.20). However, the Secretary has not prescribed particular fishway devices for the project, and hence no such costs have been determined. Any challenge that WP&L

might have as it pertains to potential costs is therefore not ripe. *See Metzenbaum v. FERC*, 675 F.2d 1282, 1289–90 (D.C. Cir. 1982).

Accordingly, we deny the petition for review.

1

RANDOLPH, *Circuit Judge*, concurring: *Bangor Hydro–Electric Co. v. FERC*, 78 F.3d 659 (D.C. Cir. 1996), drew an analogy to *Escondido Mutual Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765 (1984), and held (1) that in licensing cases such as this, the Federal Energy Regulatory Commission must accept conditions the Department of the Interior prescribes, and (2) that Interior's conditions must be supported by substantial evidence. 78 F.3d at 662–63. This odd division of authority raises the question whether Interior can develop all of its evidence internally, without affording the applicant some sort of hearing. *See* Henry J. Friendly, *Some Kind of Hearing*, 123 U. PA. L. REV. 1267 (1975). So far as we can tell, Interior offered the petitioner here no opportunity for a hearing. I nonetheless join the court's opinion because the petitioner did not raise, before us or the Commission, any objection to Interior's procedure for developing its prescription.