**S.D. WARREN CO., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.**

No. 04–1105.

United States Court of Appeals,
District of Columbia Circuit.

May 6, 2005.

Nancy J. Skancke, Gkrse, Washington,
DC, for Petitioner.

Cynthia Ann Marlette, Dennis Lane, So-
licitor, Beth Guralnick Pacella, Attorney,
Federal Energy Regulatory Commission,
Washington, DC, for Respondent.

Before: GINSBURG, SENTELLE and
HENDERSON, Circuit Judges.

### *JUDGMENT*

PER CURIAM.

This cause was heard on the record from
the Federal Energy Regulatory Commis-
sion and on the briefs and arguments by
counsel. For the reasons set out in the
accompanying memorandum, it is

**ORDERED** that the petition for review
is denied.

Pursuant to D.C. Circuit Rule 36, this
disposition will not be published. The
Clerk is directed to withhold issuance of
the mandate herein until seven days after
resolution of any timely petition for re-
hearing or rehearing en banc. *See* Fed. R.
App. P. 41(b); D.C.Cir. Rule 41.

## MEMORANDUM

The Federal Energy Regulatory Commission (FERC or Commission) issued a series of orders granting licenses to S.D. Warren Company (Warren) to operate and maintain five hydroelectric projects on the Presumpscot River in the State of Maine. *S.D. Warren Co.*, Project Nos. 2897–003, 2932–003, 2941–002, 2931–002 and 2942–005, 105 FERC ¶ 61,013, 2003 WL 22279522 (2003) (Multi–Project Order); *S.D. Warren Co.*, Project No. 2931–002, 105 FERC ¶ 61,010, 2003 WL 22279523 (2003); *S.D. Warren Co.*, Project No. 2932–003, 105 FERC ¶ 61,011, 2003 WL 22279524 (2003); *S.D. Warren Co.*, Project No. 2941–002, 105 FERC ¶ 61,012, 2003 WL 22273231 (2003); and, *S.D. Warren Co.*, Project No. 2942–005, 105 FERC ¶ 61,009, 2003 WL 22279525 (2003). Pursuant to the terms of the Federal Power Act (FPA), 16 U.S.C. §§ 792 *et seq.*, the FERC attached conditions to the licenses to protect environmental and recreational interests affected by Warren's hydroelectric projects. The conditions included fishway prescriptions filed by the Department of Interior (Interior) under § 18 of the FPA, *id.* at § 811, that required Warren to install eel ladders at each project dam to facilitate upstream migration by American eel and mandated an eight-hour shutdown of the project turbines for an eight-week period in the fall of each year to protect downstream eel migration. Multi–Project Order, 105 FERC at 61,138, ¶¶ 42–43. Interior also placed conditional obligations on Warren to provide upstream and downstream fish passage facilities at each project dam as fish passage is achieved at the next most downstream dam. *Id.* at 61,-137–38, ¶¶ 35–41. Specifically, if fish passage is achieved at a downstream dam not controlled by Warren over which the FERC lacks jurisdiction, within two years Warren is required, *inter alia*, to construct denil fish ladders at its most downstream dam. *Id.* at 61,137, ¶ 36. Construction of fish passage facilities at each of Warren's upstream dams is conditioned on the attainment of specific fish population triggers at the next downstream dam. *Id.* The FERC also attached conditions imposed by the State of Maine pursuant to the state water quality certification (WQC) process under § 401 of the Clean Water Act, 33 U.S.C. § 1341(d). Maine's WQC conditions imposed, *inter alia*, dissolved oxygen standards and minimum bypass flows (intended to mitigate the dewatering of the Presumpscot River spillways below each project) and required Warren to develop a recreational facility enhancement plan for each project. *See* Multi–Project Order, 105 FERC at 61,136, ¶ 25. In addition, pursuant to § 10(a) of the FPA, 16 U.S.C. § 803(a), the Commission imposed conditions designed to ensure that the projects would "be best adapted to a comprehensive plan for ... the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public uses, including ... recreation[ ]." *Id.* at § 803(a)(1). Based on the Final Environmental Impact Statement (FEIS) issued by the Commission staff on June 26, 2002, the FERC required Warren, *inter alia*, to develop a Shoreline Management Plan (SMP) for its two largest projects with a shoreline buffer zone of 200 feet. Multi–Project Order, 105 FERC at 61,141–42, ¶¶ 64–66. The FERC also required Warren to monitor and report on recreational use near the project sites every 12 years. *Id.* at 61,149–50, Article 409. The FERC issued the licenses for a 40–year term. *Id.* at 61,144, ¶ 86.

Warren petitioned the Commission for rehearing. On rehearing, the FERC upheld the orders with respect to the license requirements which it had included and denied rehearing as to the § 18 and § 401

conditions, concluding that it had no authority to revise or remove those provisions from the licenses. *S.D. Warren Co.,* Project Nos. 2897–005, 2931–004, 2932–006, 2941–004, and 2942–007, 106 FERC ¶ 61,087, 61,293–94, ¶¶ 3, 4, 7, 11–14, 16 & nn. 7–8, 13, 2004 WL 179299 (issued January 29, 2004) (Rehearing Order). *See Bangor Hydro–Elec. Co. v. FERC,* 78 F.3d 659, 663 (D.C.Cir.1996) ("[I]t is not the Commission's role to judge the validity of Interior's position—substantially or procedurally."); 33 U.S.C. § 1341(d) ("Any certification provided under [§ 401] . . . shall become a condition on any Federal license or permit subject to the provisions of this section."). *See also Alabama Rivers Alliance v. FERC,* 325 F.3d 290, 292–93 (D.C.Cir.2003) (same).

■ Warren challenges the sufficiency of the evidence in the record to support the Commission's § 10 conditions and Interior's § 18 prescriptions. Warren also challenges the 40–year license term as arbitrary and capricious. We uphold the Commission's orders because they are supported by substantial evidence in the record, 16 U.S.C. § 825l(b), and because the Commission "examined the relevant data and provided a reasoned explanation supported by a stated connection between the facts found and the choice made." *North Carolina v. FERC,* 112 F.3d 1175, 1189 (D.C.Cir.1997) (internal quotation marks omitted). The conditions imposed by the Commission under § 10 are supported by substantial evidence. The FEIS upon which the Commission relied considered the comments of several entities, including the FWS and National Park Service, as well as the Maine Department of Marine Resources, the Maine Atlantic Salmon Commission, the Maine Department of Inland Fisheries and Wildlife and three individuals. *See* Multi–Project Order at 61,-135, ¶ 18 & n. 5. The Commission altered

the scope of the conditions recommended by the FWS, reducing the 500–foot buffer zone for the SMPs to 200 feet and decreasing the reporting requirement for recreational use studies from every six years to every 12 years, because the FWS had failed to provide sufficient evidence to support its more stringent recommendations. *Id.* at 61,141–42, ¶¶ 64–66.

With respect to Warren's challenge to Interior's fishway prescriptions under § 18, we apply the same arbitrary and capricious standard that governs the actions of the Commission. *Wisconsin Power & Light Co. v. FERC,* 363 F.3d 453, 461 (D.C.Cir.2004). Interior's fishway prescriptions must be "reasonably related" to its goal of fish preservation. *Bangor Hydro–Electric,* 78 F.3d at 663. The scientific evidence in the record demonstrates significant populations of American eel and a 2000 study of the Presumpscot projects commissioned by Warren documents the extent to which the project dams impaired the ability of the eels to migrate upstream due to difficulty ascending dam faces. Studies of similar projects demonstrated the hazards of downstream migration, specifically, high mortality rates caused by project turbines. Interior's prescriptions are reasonably calculated to mitigate these harms. The required eel passageways provide for efficient upstream migration at a "relatively low cost," according to the FEIS. Interior's requirement that Warren shut down turbine operation for a period of eight hours per day for eight weeks during peak migration is likewise a reasonable prescription. Interior reasonably concluded that current scientific evidence does not permit a reliable estimate of a shorter peak migratory period that would ensure similar protection of the eel with a less stringent shutdown requirement. Interior has directed Warren to conduct a three year study of migratory patterns, the results of which may enable Interior to

reduce the 8/8 requirement without proportionally increasing the risk to migrating eels. Likewise, Interior's prescriptions with respect to anadromous fish species are reasonable. The fish passageway requirements are conditioned on restoration of the relevant species to the areas below each project. In the absence of species restoration, Warren need not undertake any construction based on the prescription. The target levels for fish population that trigger action, roughly 20 per cent of the maximum estimated population size, are reasonably calculated to ensure that Warren need not undertake construction at its upstream projects unnecessarily.

■ The conditions imposed by the FERC require Warren to undertake a "moderate amount of construction and environmental mitigation and enhancement measures." *See* Multi–Project Order at 61,144, ¶ 86. The record evidence supports the Commission's assessment. More extensive construction that might be required under Interior's conditional fishway prescriptions could, if actually imposed, provide a basis for extending the license term. Until that time, the 40–year license term, instead of the 50–year license Warren had sought for "extensive" construction, cannot be considered arbitrary or capricious.